0603

The STATE, Respondent, v. Danny CAULDER, Appellant.

(339 S. E. (2d) 876)

Court of Appeals

*David I. Bruck*, Columbia, *for appellant.*

*Atty. Gen. T. Travis Medlock, Asst. Atty. Gen. Harold M. Coombs, Jr.*, and *Staff Atty. Norman Mark Rapoport,* Columbia, and *Sol. Donald V. Myers*, Lexington, *for respondent.*

Heard Oct. 21, 1985.

Decided Jan. 7, 1986.

CURETON, Judge:

Appellant Danny Caulder was convicted of murder and criminal sexual conduct in connection with the death of Jean Iriel. Caulder appeals from a life sentence imposed on the murder charge and a thirty-year sentence on the criminal sexual conduct charge. We reverse and remand for a new trial.

On appeal Caulder raises issues regarding (1) denial of his right to confront and cross-examine witnesses; (2) denial of his right to call a witness; (3) failure to charge the jury on certain propositions of law; and (4) denial of his right to counsel. The evidence upon which Caulder's conviction rests is mostly circumstantial. A summary of the evidence follows.

The State's evidence showed that Jean Iriel was reported missing when she did not return home on the night of September 10, 1983. Her automobile was found by the Lexington County Sheriff's Department at the intersection of Hook and

Morningside Streets near West Columbia in Lexington County about a mile from her home at approximately 5:00 P.M. on September 11, 1983. After the police pried open the trunk of the automobile, her partially naked body was found inside.

An autopsy revealed that Ms. Iriel died of asphyxiation most likely caused by manual strangulation. The time of her death was estimated to be between 2:00 A.M. and 6:00 A.M. on September 11. Analysis of her vaginal swabs revealed the presence of semen but no sperm.

The deceased was last seen alive at the Landing Strip, a private nightclub where both she and Caulder were members. During the early morning hours of September 11, a witness claimed to have seen Caulder and the deceased leave the club together around 2:00 A.M.

The deceased's automobile came to rest at the intersection of Hook and Morningside Streets between 5:45 and 7:30 A.M. on September 11. A tenant of the trailer park where the crimes allegedly took place testified he saw Caulder walking down the street at a point between the car's location and Caulder's residence at 7:45 A.M. that day.

On September 13, a prospective tenant of a trailer owned by Caulder's stepfather called the police after he discovered suspicious items in the trailer. Police found ladies slippers and eyeglasses in the living room of the trailer. Blood found in the bedroom was consistent with that of the deceased. Also found in the bedroom were a piece of flesh, buttons, a bottle of cleaner, and some blue materials. Fingerprints found in the trailer did not match Caulder's. Personal items belonging to the deceased were found outside the trailer. The State also presented the testimony of a jailhouse informant who claimed Caulder confided in him that he thought he had gotten "away with killing this woman."

Caulder testified in his defense that he had been at the Landing Strip on September 10; that he left alone around 2:00 A.M. on September 11 and then spent several hours walking around brooding over his marital problems. He denied both that he had made the alleged statement to the jailhouse informant and that he had access to the house trailer which was the alleged scene of the crimes. He also presented evidence that the deceased had been seen with another man on

the night of September 10. An analysis of Caulder's body fluid was inconclusive and demonstrated that he was a member of a class of potential depositors of the semen comprising sixty-four percent of the male population.

## I.

Several days prior to trial, Caulder's attorney moved pursuant to *Brady v. Maryland,* 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. (2d) 215 (1963) to produce the results of the blood test of David McElveen.[1] The State refused to disclose the results at that time claiming that its prosecutorial strategy would be compromised.

Thereafter the trial judge and the solicitor had an *ex parte* conference after which the judge ruled that the State did not have to disclose the test results. Just before trial, however, the State voluntarily provided the test results to Caulder. Our Supreme Court has held that *ex parte* communications between the court and the solicitor are impermissible. *Locklear v. Harvey,* 273 S. C. 58, 254 S. E. (2d) 293 (1979); *State v. McGuinn,* 268 S. C. 112, 232 S. E. (2d) 229 (1977). Nevertheless, we perceive no prejudice from the actions of the court since the test results were furnished Caulder prior to trial. *State v. McCoy,* 285 S. C. 115, 328 S. E. (2d) 620, 621 (1985).

## II.

Caulder next assigns error to the failure of the trial judge to permit him to cross-examine the State's forensic serologist on whether David McElveen was a potential depositor of semen in the deceased. We find no merit to this argument. On cross-examination the serologist testified without objection that Caulder was within a blood group of possible depositors of semen that encompassed sixty-four percent of the male population. Caulder sought to elicit from the serologist that McElveen also fell within that same category. The State objected to the testimony and the trial judge sustained the objection based on relevancy.

In *State v. Gregory,* 198 S. C. 98, 16 S. E. (2d) 532 (1941), the Court sustained the exclusion of certain evidence because it

---

[1] David McElveen lived in the mobile home park where the mobile home which was the alleged scene of the crimes was located and had helped the owner repair the mobile home the day before the crimes occurred.

did not sufficiently link a third person with commission of the crime involved and because the collateral matter tended to confuse the jury. The Court, citing 16 C. J. *Criminal Law* Section 1085 at 560 (1918) stated: "At any rate the evidence offered by the accused as to the commission of the crime by another person must be limited to such facts as are inconsistent with his own guilt, and to such facts as raise a reasonable inference or presumption as to his own innocence; evidence which can have (no) other effect that to cast a bare suspicion upon another, or to raise a conjectural inference as to the commission of the crime by another, is not admissible." 198 S. C. at 104, 16 S. E. (2d) at 534.

The Court's holding in *Gregory* is pertinent here. The potential class of semen donors that Caulder attempted to place McElveen into was too enormous to remotely show that McElveen committed the crimes. The trial judge properly exercised his discretion in excluding this testimony especially in light of the fact that the other evidence of McElveen's participation in the crimes was tenuous.

### III.

Caulder sought to introduce the testimony of Minnie Lee Sutton, a neigbor of the deceased. The offer of proof showed that Ms. Sutton would have testified that on September 11, 1983, she received three telephone calls from an unidentified person relating to the location of the body of the deceased. The solicitor objected to the testimony on the basis that it was inadmissible hearsay. The trial judge sustained the objection. "The conduct of the trial and the admission or exclusion of evidence is left largely to the discretion of the trial judge. In order to justify relief ... it must be demonstrated not only that the trial judge committed error, but also that the error was prejudicial and denied to an accused person his right to a fair trial." *State v. Greene*, 255 S. C. 548, 180 S. E. (2d) 179, 186 (1971). *See State v. Hale*, 284 S. C. 348, 326 S. E. (2d) 418, 421 (Ct. App. 1985). Despite the stated intention of Caulder's counsel to introduce the telephone conversations for purposes other than for the truth of the statements, there could have been no other purpose for their introduction than to prove the truth of the conversations, to wit, that someone other than Caulder was involved in the crimes. *See State v.*

*Williams*, 285 S. C. 489, 331 S. E. (2d) 354 (Ct. App. 1985) (rule against hearsay discussed). We find no error in the exclusion of the statements.

## IV.

Jim Ross, who had been incarcerated in the same jail with Caulder, testified that Caulder told him that "I think I got away with killing this woman." On cross-examination Ross admitted telling a police officer that he had heard someone else confess to commission of the crimes with which Caulder was charged. After Ross testified that this other person confessed after reading about the crimes in a newspaper, Caulder's counsel introduced a taped conversation in which Ross stated that the confession was made two days before the news was published. Over the objection of Caulder's counsel the trial judge instructed the jury that Ross's inconsistent statements could be used only for impeachment purposes and not as proof of what he previously stated.

A prior inconsistent statement is admissible as substantive evidence when the declarant testifies at trial and is subject to cross-examination. *State v. Copeland*, 278 S. C. 572, 581, 300 S. E. (2d) 63, 69 (1982). The State attempts to distinguish *Copeland* on the ground that *Copeland* involved inconsistent statements made by the witness himself, while here, the person who made the admission to Ross was not before the court nor subject to cross-examination. The distinction is not valid. The inconsistency here is not in the content of the admission, but rather in Ross's statements as to when he heard the confession. The trial judge's instruction was, therefore, in error because it deprived the jury of evidence that someone else confessed to the crimes before news of the crimes was published in the newspaper.

## V.

Caulder next argues that his conviction should be reversed because the trial judge failed to charge (1) the State must prove his presence at the scene of the crime beyond a reasonable doubt, and (2) a guilty verdict cannot be based upon suspicion. In reviewing a jury charge for error, we must consider the charge as a whole in light of the evidence and issues presented at trial. *State v. Hyman*, 276 S. C. 559, 281

S. E. (2d) 209, 214 (1981). A review of the trial judge's charge to the jury in its entirety shows that he charged that each element of each crime must be proved beyond a reasonable doubt. *State v. Griffin*, 277 S. C. 193, 285 S. E. (2d) 631, 634 (1981) (charge given concerning elements of a crime adequately covered substance of appellant's requested charges). Proof of each element would include proof that Caulder was present at the scene of the crimes. Likewise, the general charge adequately informed the jury that a conviction could not be based on suspicion. As stated in *State v. Hyder*,

> When the trial Judge in this case instructed the jury that the burden was upon the State to prove the guilt of the appellant beyond a reasonable doubt, this was tantamount to charging the jury that suspicion, however strong, would not be sufficient to support a conviction. In view of the foregoing charge and the instruction as to circumstantial evidence, we think there was no prejudice to the appellant by the failure of the trial Judge to give the requested instruction.

242 S. C. 372, 379, 131 S. E. (2d) 96, 100 (1963).

## VI.

After Caulder's arrest on September 15 and during the booking process, law enforcement officers noticed scratches on his chest. Pursuant to a search warrant issued by the court, a medical doctor examined the scratches and estimated them to be between one and five days old. During the course of the examination and without first giving *Miranda* warnings,[2] the doctor asked Caulder how he received a particular scratch. Over Caulder's objection, the following testimony of the doctor was introduced:

Q. Dr. Calvert, did you have occasion to — What, if anything did you ask the defendant about what I will call the other wound, the one on the chest?

A. In the process of examination, as you do most patients, you inquire as to — you know, normally what symptoms he might have or problems. In the course of examination I just asked what had caused the wounds on the hand

[2] *Miranda v. Arizona*, 384 U. S. 436, 86 S. Ct. 1602, 16 L.Ed. (2d) 694 (1966).

and arms. The reply was that this was caused, got those in his work. When I asked about the wound on the chest, the reply was that he did not know. I asked no further questions.

Q. The other wounds he said were work related?

A. Yes, sir.

Q. This one up here he said he did not know how he got that?

A. He did not know.

At trial, Caulder denied the doctor asked him about a specific scratch on his chest. He testified that when the doctor asked him about the scratches he thought he was referring to all the scratches collectively. He argues that the admission of his unwarned responses to Dr. Calvert's questions violated his Fifth Amendment right against self-incrimination and his Sixth Amendment right to be assisted by counsel. The State has responded by asserting that (1) no custodial interrogation occurred; (2) Caulder's statements to Dr. Calvert were not incriminating; (3) *Miranda* warnings given to Caulder some two and one-half hours before the questioning obviated the need for additional warnings during the doctor's questioning; (4) Caulder waived his right to remain silent by not objecting to the questions; and (5) the error, if any, in admitting the statement was harmless.

We deal with the State's assertions in seriatim. As pertains to the contention that the questioning was not custodial, this argument is without merit. According to the search warrant obtained by the State, the purpose of the search (examination) of Caulder was to discover any "evidence of a physical struggle." Thus, the purpose of the medical examination was to gather evidence, not to provide medical treatment. Moreover, the examination took place in the presence of a deputy solicitor and two police officers. Clearly under State law, Caulder was in custody. *State v. Doby*, 273 S. C. 704, 707, 258 S. E. (2d) 896 (1979) (a person is "in custody" where there has been a restriction on a person's freedom). Nevertheless, the State argues that the strictures of *Miranda* should not apply because Dr. Calvert entertained no prosecutorial motive when he inquired about the scratches. This argument is contrary to the teachings of *Miranda*. As stated by the Supreme Court in *Rhode Island v. Innis*, 446 U. S. 291, 100 S. Ct. 1682, 64 L.Ed. (2d) 297 (1980):

> [T]he *Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent. That is to say, the term "interrogation" under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect.

446 U. S. at 301-02, 100 S. Ct. at 1690.

Here, the solicitor and police should have known that Dr. Calvert's questions were reasonably likely to produce incriminating responses. Further, the fact that Dr. Calvert was a medical doctor and not a policeman does not immunize the questions from *Miranda* scrutiny. *See Estelle v. Smith*, 451 U. S. 454, 101 S. Ct. 1866, 68 L.Ed. (2d) 359 (1981); *State v. Woomer*, 278 S. C. 468, 299 S. E. (2d) 317 (1982).

The State next argues that the response made by Caulder that he did not know where the scratch came from is not incriminating. We gleen from the record that the State introduced the response to reflect both upon Caulder's credibility and also to show that Caulder's failure to reveal how he received the scratch was an incriminating circumstance.[3] The definition of "incriminating" as laid down in *Miranda* and reiterated in *Rhode Island v. Innis* is:

> By "incriminating response" we refer to any response — whether inculpatory or exculpatory — that the *prosecution* may seek to introduce at trial. As the Court observed in *Miranda* ... "The privilege against self-incrimination protects the individual from being compelled to incriminate himself in any manner; it does not distinguish degrees of incrimination. ..."

466 U. S. at 302, n. 5, 100 S. Ct. at 1690, n. 5. Caulder's statement to Dr. Calvert was thus "incriminating" within the meaning of *Miranda* simply because the State used it against him at trial.

---

[3] We note that in the State's closing argument to the jury, the solicitor makes much to do about Caulder not knowing how he got the scratch.

The State next argues that even if *Miranda* were applicable, Caulder waived his right to remain silent because he had been given *Miranda* warnings just two and one-half hours prior to the questioning and also because he did not object to the questioning. Of course, an accused after being initially advised of his *Miranda* rights may himself validly waive his rights and respond to interrogation. *See North Carolina v. Butler*, 441 U. S. 369, 372-77, 99 S. Ct. 1755, 60 L.Ed. (2d) 286 (1979). However, the State bears the burden of proving that the accused's statements were voluntarily made. *State v. Scott*, 269 S. C. 438, 446, 237 S. E. (2d) 886, 890 (1977). Here, Caulder had previously retained an attorney who, on the day prior to his arrest, accompanied him to the sheriff's department where he made a statement. Caulder's insistence on the presence of counsel prior to making the other statement, his apparent confusion as to the role of the doctor in questioning him, coupled with his claim that he did not understand which scratches the doctor referred to during the questioning, compels us to hold that the State did not sustain its burden of showing Caulder intelligently waived his right to counsel and to remain silent.

We next determine whether the admission of the doctor's testimony regarding Caulder's statement even if violative of Caulder's *Miranda* rights was nevertheless harmless beyond a reasonable doubt. *Chapman v. California*, 386 U. S. 18, 87 S. Ct. 824, 17 L.Ed. (2d) 705 (1967). The test we must apply in making this determination, is whether there is a reasonable probability that the admission contributed to his conviction of the crimes, or if the defendant's statement was merely cumulative. *State v. Henderson*, 286 S. C. 465, 334 S. E. (2d) 519, 522-23 (Ct. App. 1985). *See also Chapman*, 386 U. S. at 24-26, 87 S. Ct. at 828-829. While we are disposed to hold that the admission of this latter statement standing alone was harmless error, we must assess the record as a whole to determine the probable impact of the admission of the improper evidence on the jury. *Thompson v. Leeke*, 590 F. Supp. 110 (D. S. C. 1984), *aff'd*, 756 F. (2d) 314 (4th Cir. 1985).

The circumstantial nature of the State's case, the improper admission of Caulder's statement to the doctor, and the failure of the trial judge to permit the introduction of Ross's prior inconsistent statements as substantive evidence require

us to reverse. Since the State's case depended to some degree on showing that Caulder's testimony regarding his actions on September 10 and 11, 1983, was not credible, we cannot conclude beyond a reasonable doubt that the trial errors did not influence the jury's verdict.

Accordingly, the conviction of Caulder is reversed and the case remanded for a new trial.

Reversed and remanded.

SANDERS, C. J., and GARDNER, J., concur.