508 S.E.2d 870

The STATE, Respondent,

v.

William David TAYLOR, Appellant.

No. 24857.

Supreme Court of South Carolina.

Heard Oct. 6, 1998.

Decided Nov. 23, 1998.

Rehearing Denied Jan. 6, 1999.

Assistant Appellate Defender Robert M. Dudek, of South Carolina Office of Appellate Defense, of Columbia, for appellant.

Attorney General Charles M. Condon, Deputy Attorney General John W. McIntosh, Assistant Deputy Attorney General Donald J. Zelenka, Assistant Attorney General John P. Riordan, all of Columbia; and Solicitor Walter M. Bailey, Jr., of Summerville, for respondent.

BURNETT, Justice:

Appellant was convicted of murder and sentenced to life imprisonment. We affirm.

## FACTS

At the beginning of trial, appellant stipulated he killed his wife, Janet, by strangling her with a t-shirt; he denied the killing was murder. The homicide occurred on August 31, 1994.

The following evidence was presented. Appellant and Janet separated in June 1994. According to different witnesses, appellant threatened to kill his wife on several occasions after their separation. Specifically, appellant stated, referring to his wife: "if that bitch don't come home, I'm going to kill her;" "either you are going to have sex with me or I'll kill you;" "he should have killed her and [her daughter] a long time ago . . .;" and "if he had her right then, he'd ring her neck."

Appellant's neighbor saw a man at the Taylor's home after Janet returned to the marital home.[1] In early August, the neighbor had a conversation with appellant. Appellant indicated he knew Janet was seeing this man and stated, "I'm not going to let anyone sleep in my bed; I'd kill her first." The neighbor replied, "I told [appellant] not to be another O.J. Simpson."

---

1. Appellant was living elsewhere.

According to appellant's brother, on the afternoon of August 31, appellant drove from Dorchester County to Orangeburg. Appellant told his brother he thought he had killed Janet. The brother reported the claim to the police. The Orangeburg police arrived and arrested appellant without incident.

One of the arresting officers testified appellant had cut his wrist with a box cutter in an apparent suicide attempt. Appellant inquired if his wife was dead and, if so, "then that was good; that he had wasted twenty-one years of his life." Two other officers testified appellant repeatedly asked "is the bitch dead?" and stated "I hope she's dead because she ruined [my] life."

Appellant's sister testified Janet began a relationship with Richard Pritchard in May 1994. The sister testified, despite their separation, appellant continued to give Janet money and, at times, the two "acted like newlyweds."

The sister testified appellant called her on August 31 and stated he thought he had killed Janet. The sister testified she thought appellant then stated he was "just kidding." Appellant's sister stated he "sounded kind of sad." The sister went to Janet's home; she gave the deputies permission to break a window to enter the home.

Dorchester Deputy Sheriff Limehouse testified Sergeant Moore broke a window pane, entered the home, and then unlocked the front door. Janet's body was found in a bedroom, under blankets, clothes, and a guitar case. Appellant stipulated he killed Janet in one part of the home and dragged her to another.

The deputy sheriff testified it appeared there had been a struggle in the home. A lamp was knocked over. A broken necklace and torn watchband were on the floor.

Richard Pritchard, Janet's paramour, testified on appellant's behalf. He stated he was engaged in an affair with Janet from May to August 1994. Appellant was aware of the relationship in May and had no animosity about Pritchard's relationship with Janet. Several weeks before Janet's death, appellant shook Pritchard's hand and stated he was glad Janet had met someone nice.

Appellant testified Janet left him in May 1994. He stated Janet had told him Pritchard was a friend, but appellant suspected the relationship was more. He testified he did not want to believe his wife had a relationship with Pritchard; he wanted Janet back. Although they were separated, on occasion, Janet led appellant to believe there was a chance for their relationship.

Days before the homicide, appellant helped Janet with car repairs. On the day of the killing, appellant bought her a car battery and helped her pack her possessions. Her home was in foreclosure. She asked appellant for money to rent an apartment. Appellant stated he thought she was going to live with her parents.

Appellant testified:

I had been drinking a little bit ... I was sitting on the floor ... [Janet] got mad with me, and I just kind of laughed at her a little bit. I rubbed her on the leg. I said, 'what are you getting'—because Janet didn't normally get upset like that ... But she got up and started pacing back and forth, and *she started telling me that Rick was her lover. And she told me that Leonard Bogard, she had had sex with him while she was still married to me ... [Janet] was very angry at me ... She said, 'Bill, you're never going to change; you're sorry as hell,' and she said, 'I have no intentions of going back to you.' She plainly told me that she was only using me for my money ... At that time, I started to get up and she kicked me in the groin* ... She went toward the television set on the end of the couch ... And somehow or another she came up to me. *I don't know if she had an object in her hand. I have no idea what it was at the time, but I ended up with her shirt, her t-shirt, from the back of her trying to hold her off of me, from hitting me. She kept doing this (indicating). She had something in her hand—I don't know what it was—and she was kicking me also. And the next thing I know she stopped doing everything, and she was down on the floor, and she was dead.*

(emphasis added).

Appellant testified he tried to resuscitate Janet. He then dragged her body to the back bedroom. He stated he did not mean to hurt Janet and denied ever threatening to kill her.

Appellant testified he later discovered Janet had been holding a box cutter. The box cutter had blood on it. Appellant took the box cutter.

Appellant testified when Janet was coming towards him, he reached behind her, grabbed her t-shirt at the neck, and squeezed the shirt tightly. He did not know how long he held onto the shirt. Appellant's sisters testified Janet had asthma.

Appellant explained Janet must have cut her left hand while transferring the box cutter between her hands. Appellant denied slashing Janet's hand with the box cutter. He further denied his wife smeared blood on the front door while attempting to flee.

The pathologist testified the decedent died from asphyxia due to ligature strangulation. She stated "it takes a good deal of pressure to asphyxiate somebody by means of a t-shirt [pulled across the front of the neck] . . . it takes a good deal of force to do that." The pathologist testified it would take a "number of minutes" to asphyxiate someone with a t-shirt.[2] She testified there were no indications the decedent had asthma.

The decedent had several scrapes on her back, bruises on the back of her left arm, bruises on the inside of her thighs, a bruise on her scalp, and bruises on her lower legs. The pathologist stated the bruises probably occurred just before death.

The decedent had a two inch laceration on her left palm which the pathologist stated could have been inflicted with a knife. The pathologist described this wound as "defensive." Blood was also found on the decedent's right hand. The pathologist agreed with the defense that the location of the blood was consistent with the decedent holding something in that hand.

The forensic serologist testified both the decedent and appellant had the same blood type. She was unable to determine the decedent's blood sub-type, but determined appellant's sub-type. Human blood was found on the decedent's right hand and on scrapings from the victim's fingernails, but no other identifiable characteristics were available. Blood on

2. The victim was 5′7″ and weighed over 200 pounds.

the decedent's left hand and t-shirt was consistent with the decedent's blood but inconsistent with appellant's blood. The blood stains on appellant's shorts and shirt were consistent with his blood type (and the decedent's). Human blood was identified on the box cutter taken from appellant, on a box from the decedent's home, and on a swab taken from the front door of the decedent's home, but no further identifying information was available on these items.

Appellant maintains the essential jury issue was whether the homicide was murder or voluntary manslaughter.[3]

### ISSUES

I. Did the trial judge err by refusing to allow appellant to present the details of a prior difficulty with the decedent?

II. Did the trial judge err by allowing the solicitor to publish Pritchard's entire statement to the jury?

III. Did the trial judge err by allowing the solicitor to impeach appellant with a prior conviction for criminal domestic violence?

IV. Did the trial judge err by denying appellant's motion for a new trial based on after-discovered evidence and based on an alleged *Brady v. Maryland*[4] violation?

### DISCUSSION

#### I.

█ The State presented appellant's brother as a witness. During cross-examination, the following colloquy was exchanged:

Q. Okay. Do you recall an incident where Janet hit [appellant] on the head with a beer bottle at your house?

A. Yes, sir.

Q. Can you tell the jury about that?

[Solicitor]: Your honor, I object to that. . . .

---

3. Appellant did not request a charge on self-defense. The jury was not instructed on self-defense. The trial judge did instruct the jury on involuntary manslaughter.

4. 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

During a bench conference, appellant indicated he was trying to establish Janet was the aggressor. He proffered the following testimony:

Q. Could you tell us about the incident concerning the beer bottle?

A. [Appellant] and Janet got in an argument, and they was (sic) up at my house. They was (sic) both drunk. I was drunk. And Janet hit him in the head with the bottle about three times. It never broke, but she hit him pretty hard and he staggered back, and she went and got in the car and left him at my house in Orangeburg.

The trial judge sustained the solicitor's objection.

Appellant argues the trial judge erred by refusing to allow him to question his brother concerning the specifics of the incident with the beer bottle. He contends the testimony was relevant for the purpose of establishing the decedent was the aggressor. We disagree.

■ In homicide cases, evidence that the accused and the decedent had previous difficulty is admissible. The evidence is admissible to show the animus of the parties and to aid the jury in deciding who was the probable aggressor. The general details of the difficulty, however, are inadmissible. *State v. Atchison,* 268 S.C. 588, 235 S.E.2d 294 (1977); *State v. Clinkscales,* 231 S.C. 650, 99 S.E.2d 663 (1957); *State v. Bush,* 211 S.C. 455, 45 S.E.2d 847 (1948); *State v. Evans,* 112 S.C. 43, 99 S.E. 751 (1919); *see also State v. Williams,* 321 S.C. 327, 468 S.E.2d 626 (1996); *State v. Graham,* 161 S.C. 362, 159 S.E. 838 (1931).

Appellant's brother testified the decedent hit appellant on the head with a bottle on a prior occasion. This testimony supported appellant's contention the decedent was the aggressor at the time of her death. The trial judge properly admitted this testimony and properly excluded the specifics of the incident. *State v. Clinkscales, supra* (evidence husband and wife had previous difficulties was admissible, however, testimony husband shot wife in the back with a shotgun weeks before her death was inadmissible).

Moreover, any error in refusing to admit the proffered testimony was harmless. Appellant's brother had already

testified the decedent hit appellant in the head with a beer bottle. The proffered testimony adds little favorable evidence for appellant. *Gamble v. International Paper Realty Corp. of S.C.*, 323 S.C. 367, 474 S.E.2d 438 (1996) (where excluded testimony was merely cumulative, there was no error); *State v. McWee*, 322 S.C. 387, 472 S.E.2d 235 (1996), *cert. denied*, 519 U.S. 1061, 117 S.Ct. 695, 136 L.Ed.2d 618 (1997) (error without prejudice does not warrant reversal).

## II.

As noted above, appellant called Richard Pritchard, the decedent's paramour, as a witness. On direct examination, Pritchard admitted he had an affair with the decedent between May and August 1994.

On cross-examination, Pritchard testified he first met the decedent in *March* 1994. He stated the decedent and appellant separated two months later. At that time, Pritchard and the decedent began a sexual relationship. Pritchard testified appellant became aware of his relationship with the decedent in May or June of 1994.

On redirect, appellant questioned Pritchard concerning the statement he had given law enforcement after the decedent's death. Appellant showed the written statement to Pritchard and confirmed his signature at the bottom of the statement. Appellant had Pritchard read the following sentence from the statement: "I met Janet Taylor on *May* the 14th, 1994." Thereafter, appellant examined Pritchard as to the inconsistencies in the date he met the decedent. Pritchard explained he was nervous when he gave his statement and had in fact met the decedent on March 14, 1994.

The solicitor requested permission to publish all of Pritchard's statement pursuant to Rule 106, SCRE. Appellant objected, arguing he had not introduced the statement into evidence. The trial judge overruled the objection. The solicitor published Pritchard's statement to the jury in its entirety.

Appellant contends the following portion of the statement is prejudicial:

When [appellant] learned of my presence in [decedent's] life, he investigated me, found out my address, phone number,

place of employment; I'm not sure what else. Before I met [appellant] he called me at my house and told me that [decedent] had gone to a bar and brought a man home to spend the night. He also told me that she was still having sex with him. I believe this was an attempt to break us up.

Appellant contends because he did not introduce Pritchard's statement as an exhibit, the trial judge erred by allowing the solicitor to publish all of Pritchard's statement.

Rule 106, SCRE, provides:

When a writing, or recorded statement, or part thereof is introduced by a party, an adverse party may require the introduction at that time of any other part of any other writing or recorded statement which ought in fairness to be considered contemporaneously with it.

Rule 106, SCRE, has not been interpreted by this Court. The text of Rule 106, SCRE, is substantially similar to Rule 106 of the Federal Rules of Evidence.

Rule 106, Fed.R.Evid., is based on the " 'rule of completeness' and seeks to avoid the unfairness inherent in 'the misleading impression created by taking matters out of context'." *Rainey v. Beech Aircraft Corp.*, 784 F.2d 1523, 1529 (11th Cir.1986), *citing* Fed.R.Evid. 106 advisory committee notes.[5]

Rule 106 [of the Federal Rules of Evidence] is a procedural device governing the timing of completion evidence; the Rule is 'primarily designed to affect the order of proof'. It means that the adverse party need not wait until cross-examination or rebuttal. As such, the Rule reduces the risk that a writing or recording will be taken out of context and that an initial misleading impression will take hold in the mind of the jury.

S. Saltzburg, M. Martin, D. Capra, *Federal Rules of Evidence Manual*, pp. 98–99 (1998), *citing, United States v. Walker*, 652 F.2d 708, 713 (7th Cir.1981); *see also*, M. Graham, *Handbook*

---

5. Before the adoption of Rule 106, SCRE, the law in South Carolina had been that "when a part of a document or writing is introduced into evidence, the remainder may be introduced by the other party ... However, the party seeking to bring out the remainder had to wait until cross-examination or the presentation of that party's case to do so." (internal citations omitted).

of *Federal Evidence,* § 106 (1996); J. Strong, *McCormick on Evidence,* § 56 (1992).

Technically, Rule 106, Fed.R.Evid., applies in instances when a party introduces a writing or recorded statement into evidence. *Rainey v. Beech Aircraft Corp., supra.* Given the purposes behind Rule 106, fairness and completeness, it is also applied where a party's use of a writing or recorded statement is "tantamount to the introduction of the [document] into evidence." *Id.* at 1529; *see also United States v. Rubin,* 609 F.2d 51 (2nd Cir.1979) (where defense counsel quoted extensively from government agents' notes, ·notes were admissible under doctrine of completeness); *Nachtsheim v. Beech Aircraft Corp.,* 847 F.2d 1261 (7th Cir.1988) (where defendant neither introduced portions of document nor questioned witness about it, plaintiffs were not allowed to impeach witness with document pursuant to Rule 106, Fed.R.Evid.); *United States v. Pendas–Martinez,* 845 F.2d 938 (11th Cir.1988) (where defense counsel did not extensively read from report to attack government witness' credibility or to suggest his testimony was inconsistent, fairness did not require admission of entire report).

■ Where Rule 106, SCRE, applies, it does not require all of the document to be introduced, merely *"any other part* of any other writing or recorded statement *which ought in fairness to be considered contemporaneously with it."* (emphasis added). Only that portion of the remainder of a statement which explains or clarifies the previously admitted portion should be introduced. *Federal Rules of Evidence Manual, supra,* at 99; *see also State v. Kelsey,* 331 S.C. 50, 71, 502 S.E.2d 63, 73–74 (1998) ("[g]enerally, where a portion of a witness's prior inconsistent statement has been introduced to impeach that witness, the entire statement is admissible in rebuttal to explain the inconsistency ... Remaining portions which are not relevant or material in the explanation of the inconsistency are not admissible.") (internal citations omitted).

Appellant effectively placed a portion of Pritchard's statement into evidence by having Pritchard read directly from the statement. Accordingly, in the interest of fairness and completeness, it would have been appropriate for the trial judge to require the introduction of any other portion of Pritchard's

statement which explained or clarified when he met the decedent, the only issue encompassed by appellant's use of Pritchard's statement. However, the remainder of Pritchard's statement did not explain or clarify when he met the decedent. Accordingly, the trial judge erred by allowing the solicitor to read the rest of Pritchard's statement.

██ Nonetheless, in order for this Court to reverse a case based on the erroneous admission or exclusion of evidence, prejudice must be shown. *State v. Bell,* 302 S.C. 18, 393 S.E.2d 364 (1990). "Whether error is harmless depends on the circumstances of the particular case. No definite rule of law governs this finding; rather, the materiality and prejudicial character of the error must be determined from its relationship to the entire case. Error is harmless when it 'could not reasonably have affected the result of the trial'." *State v. Mitchell,* 286 S.C. 572, 573, 336 S.E.2d 150, 151 (1985), *citing State v. Key,* 256 S.C. 90, 93, 180 S.E.2d 888, 890 (1971).

██ While the above-referenced portion of Pritchard's statement is prejudicial, we conclude its admission could not reasonably have affected the result of appellant's trial. The solicitor did not allude to this portion of Pritchard's statement during his closing argument. Moreover, in light of the other evidence of malice, the effect of the statement is negligible. *See* Part IV. Review of the entire record indicates admission of the statement was harmless beyond a reasonable doubt.

### *III.*

Appellant testified at trial. During his direct examination, defense counsel made a motion, unrelated to the present issue. While outside the presence of the jury, the solicitor indicated he would mention appellant's prior criminal domestic violence conviction if appellant tried to "soft petal" (sic) the marital relationship. Appellant objected, stating he had not placed his character into evidence and had limited his testimony from the time of the separation to the homicide. The trial judge instructed appellant to object at the appropriate time.

Appellant continued his direct examination. He stated "[j]ust things had kind of gotten rough for us the last couple of years ...".

On cross-examination, the following exchange occurred:

Q. You said to [defense counsel] that things were kind of rough the last couple of years; is that right?

A. Yes, sir.

Q. In fact, they've been rough a whole lot longer than that, haven't they?

A. I didn't think so. We was (sic) doing good. I was a supervisor out at work before we had the explosion that killed nine people.

Q. Answer my question now. I don't care about work and explosions. I'm talking about your relationship with your wife.

A. I thought everything was okay.

Q. Was it okay in 1986?

A. We had some problems. We both drink.

Q. And you had problems in 1986, some marital problems, didn't you?

A. Yes, sir.

Q. What kind of problems did you have back then?

A. I was arrested for domestic violence.

Q. And that involved, in December of 1986, hitting your wife over the head with a .22 rifle, didn't it?

A. No; I didn't do that. No, I did not. That was never proved in court or nothing. Me and Janet both simply went to court and I simply admitted—I paid the fine. I never really admitted to nothing.

Q. Okay. [Appellant], do you deny—

A. I truly—

Q. —that—wait; let me ask my question—

The Court: Wait a minute now. Listen to the question. Then you can answer it.

Q. Do you deny that on January the fifth, 1987, you were found guilty—

A. [Defense Counsel]: *Your honor, I object at this point.*

The Court: Over-ruled.

Q. Do you deny that on January the fifth, 1987, you appeared before Judge Miley and were found guilty of criminal domestic violence in Berkeley County for hitting your wife over the head with a .22 rifle?

A. No, I was—yes; I was.

(emphasis added).

Appellant contends the trial judge erred by allowing the solicitor to impeach him with a prior conviction for criminal domestic violence. He contends by allowing the State to impeach him with the former conviction, it was impermissibly allowed to attack his character when he had not placed his character in issue. We disagree.

■■■ Initially, we note this issue is not preserved for appeal. Appellant's general objection to the solicitor's question is insufficient to preserve this issue for appeal. *State v. Nichols*, 325 S.C. 111, 481 S.E.2d 118 (1997). Appellant's earlier claim that he would object if the State mentioned his prior conviction is also insufficient to preserve this issue for appeal. *See State v. Hill*, 331 S.C. 94, 501 S.E.2d 122 (1998) (pre-trial evidentiary ruling is not final because subject to change based on developments at trial).

■■■ In any event, this issue is without merit. In a criminal case, the State may not attack the character of the accused unless he first places his character in issue. *State v. Nelson*, 331 S.C. 1, 501 S.E.2d 716 (1998). However, "[w]here one party introduces evidence as to a particular fact or transaction, the other party is entitled to introduce evidence in explanation or rebuttal thereof, even though [the] latter evidence would be incompetent or irrelevant had it been offered initially." *State v. Stroman*, 281 S.C. 508, 513, 316 S.E.2d 395, 399 (1984). An "accused may be cross-examined as to all matters which he himself has brought up on direct examination." 98 C.J.S. *Witnesses* § 515 at 439 (1957); *State v. Allen*, 266 S.C. 468, 224 S.E.2d 881 (1976),[6] *citing* 98 C.J.S. *Witnesses* § 378 at 134–135 ("[a]s a general rule, any matter is proper subject of cross-examination which is responsive to testimony given on direct examination, or which is material or relevant thereto, and which tends to elucidate, modify, explain, contradict or rebut testimony given in chief by the witness."). The cross-examination of matters which were addressed in direct-

---

6. *Overruled on other grds. State v. Evans*, 307 S.C. 477, 415 S.E.2d 816 (1992), and *State v. Torrence*, 305 S.C. 45, 406 S.E.2d 315 (1991).

examination is not objectionable, even if the answers affect a witness' credibility and character. 98 C.J.S. *Witnesses* § 378.

 On direct examination, appellant stated "things had kind of gotten rough for us the last couple of years." This testimony implied appellant and his wife had a good relationship until recent years, an issue which was relevant to this case. We agree with appellant: this testimony did not place appellant's character in issue.[7] However, because appellant "opened the door" about his relationship with his wife, the solicitor was entitled to cross-examine him about the relationship, even if the responses brought out appellant's prior criminal domestic violence conviction. *State v. Stroman, supra* (since defendant questioned accomplice about his prior robberies, the State was permitted to inquire into facts of prior robberies, including whether defendant had participated in the robberies); *State v. Allen, supra* (where defendant testified he had not previously harmed anyone with a deadly weapon, prosecutor was permitted to inquire into extent of previous assaults); *see also State v. Faulkner,* 274 S.C. 619, 621, 266 S.E.2d 420, 421 (1980) ("[w]hile State may not attack a criminal defendant's character unless he has placed it at issue, relevant evidence admissible for other purposes need not be excluded merely because it incidentally reflects upon the defendant's reputation.") (internal citation omitted).

## *IV.*

 After his conviction, appellant moved for a new trial based on after-discovered evidence and based on an alleged *Brady* violation. He claimed the State failed to provide him with evidence that Sergeant Moore had cut his hand while breaking a window to gain access to the decedent's home. Appellant argues this evidence was material in that blood on the inside of the front door could have been from the officer, rather than the decedent. It is undisputed none of the police

---

7. *State v. Major,* 301 S.C. 181, 391 S.E.2d 235 (1990) (accused placed character in issue by testifying he did not frequent bad neighborhood and did not sell drugs); *State v. Allen, supra* (accused placed character in issue by presenting character witnesses and testifying about his criminal past).

reports provided to appellant before trial indicated an officer had cut his hand.

As noted above, at trial Deputy Sheriff Limehouse testified Sergeant Moore broke a window pane at the decedent's residence in order to enter the home. Sergeant Moore did not testify at trial. Human blood was identified on the inside of the front door. The serologist could not characterize or type the blood. Photographs show a large, although fairly faint, smear of blood near the center of the door. State's Ex. 16 and 23.

On two occasions during closing argument, the solicitor suggested the blood on the front door indicated the decedent had tried to escape appellant's attack with the box cutter by fleeing through the front door. Appellant, however, grabbed her t-shirt and choked her to death.

At the new trial hearing, Sergeant Moore testified he cut his index finger when he broke the window at the decedent's residence. He described the laceration as "small." The finger did not bleed heavily; he was able to control the bleeding with a handkerchief. He unlocked the front door and the other officers entered. Thereafter, Sergeant Moore put a latex glove on his hand. Blood appeared in the finger of the glove. As to the amount of blood, Sergeant Moore testified "... if you've ever seen somebody that (sic) blood in panty hose or hah (sic) latex glove a little by (sic) of blood looks a lot."

To obtain a new trial based on after-discovered evidence, the party must show that the evidence: 1) would probably change the result if a new trial is had; 2) has been discovered since trial; 3) could not have been discovered before trial; 4) is material to the issue of guilt or innocence; and 5) is not merely cumulative or impeaching. *Clark v. State*, 315 S.C. 385, 434 S.E.2d 266 (1993); *State v. Caskey*, 273 S.C. 325, 256 S.E.2d 737 (1979). The denial of a motion for a new trial will not be reversed absent an abuse of discretion. *State v. South*, 310 S.C. 504, 427 S.E.2d 666 (1993).

In *Brady v. Maryland, supra,* the Court held:

[S]uppression by the prosecution of evidence favorable to an accused upon request violates due process where the evi-

dence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution. 373 U.S. at 87, 83 S.Ct. at 1196–97, 10 L.Ed.2d at 218.

*Brady* only requires disclosure of evidence which is both favorable to the accused *and* material to guilt or punishment. *United States v. Bagley,* 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985). "Evidence is material . . . 'only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome'." *State v. Cain,* 297 S.C. 497, 503, 377 S.E.2d 556, 559 (1988), *citing United States v. Bagley, supra* at 682, 105 S.Ct. at 3383, 87 L.Ed.2d at 494.

For *Brady* purposes, in determining the materiality of nondisclosed evidence, an appellate court must consider the evidence in the context of the entire record. *United States v. Agurs,* 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976). However, the court should not consider the sufficiency of the evidence. The court's function is to determine whether the appellant's right to a fair trial has been impaired. *State v. Osborne,* 291 S.C. 265, 353 S.E.2d 276 (1987); *State v. Goodson,* 276 S.C. 243, 277 S.E.2d 602 (1981).

Although the defense could have more readily responded to the solicitor's argument that blood on the door belonged to the fleeing victim had it known Sergeant Moore had cut his finger, the evidence is not material for *Brady* purposes. Because the serologist could only identify the blood on the door as human but could not characterize the blood further, the solicitor still could have argued the blood came from the decedent while attempting to escape. The fact that Sergeant Moore bled would not have negated the State's theory of its case. Furthermore, considering the strength of the State's case (appellant's numerous threats to kill the decedent, the signs of struggle in the decedent's home, the defensive wound on the decedent's palm and recent bruises on her body, the fact that appellant hid the decedent's body in a back bedroom under blankets and clothes, the length of time it would take to asphyxiate someone with a t-shirt, and appellant's statements he was glad the decedent was dead), the non-disclosure of

Sergeant Moore's laceration did not impair appellant's right to a fair trial. *State v. Goodson, supra.*

Similarly, with regard to the motion for a new trial based on after-discovered evidence, the blood evidence was neither material nor likely to change the result if a new trial was held. Accordingly, the trial judge did not abuse his discretion in denying appellant a new trial based on after-discovered evidence. *State v. South, supra.*

**AFFIRMED.**

FINNEY, C.J., TOAL, MOORE and WALLER, JJ., concur.