618 S.E.2d 890

**The STATE, Respondent,**

v.

**Brenda Gail CUTRO, Appellant.**

**No. 26027.**

Supreme Court of South Carolina.

Heard May 3, 2005.
Decided Aug. 15, 2005.
Rehearing Denied Sept. 21, 2005.

Acting Chief Attorney Joseph L. Savitz and Assistant Appellate Defender Robert M. Dudek, both of S.C. Office of Appellate Defense; and Beattie I. Butler, of Charleston, for appellant.

Attorney General Henry Dargan McMaster, Chief Deputy Attorney General John W. McIntosh, Assistant Deputy Attorney General Donald J. Zelenka, and Senior Assistant Attorney General William Edgar Salter; and Solicitor Warren B. Giese, all of Columbia, for respondent.

Justice MOORE:

Appellant was convicted of two counts of homicide by child abuse for the deaths of two infants in her home daycare. We affirm.

## FACTS

Appellant and her husband Josh Cutro operated a home daycare in Irmo, South Carolina. Between January and Sep-

tember of 1993, two infants, Parker Colson and Ashlan Daniel, died at the Cutros' home. A third infant, Asher Maier, became ill while at their home and was subsequently diagnosed with serious brain damage. The State produced evidence that all three infants were victims of Shaken Baby Syndrome. Appellant was convicted of two counts of homicide by child abuse and sentenced to concurrent life sentences for killing Parker Colson and Ashlan Daniel; she was acquitted of the assault and battery charge regarding Asher Maier.

The State's theory of the case was that appellant's actions were motivated by Munchausen Syndrome by Proxy (MSBP), which the State's medical experts defined as a form of child abuse in which the perpetrator harms a child in order to garner sympathy and attention for herself.[1]

### Parker Colson

Parker Colson was almost five months old when he was found dead in his crib at the Cutros' home on January 4, 1993. According to his parents, Parker was a healthy baby and had no health problems that morning. His mother dropped him off at the Cutros' daycare at about 7:30 a.m. At 1:57 p.m., emergency personnel received a call to the Cutros' home. When they arrived at 2:11 p.m., Parker was not breathing. He was rushed to the hospital where he was declared dead.

Parker's mother testified that appellant told her the following regarding Parker's death:

A: She told me that Parker was taking a nap. She went in and checked on him. He was asleep. She went in the kitchen, reached up in the cabinet to get his food down. Josh came in behind her and screamed, Parker's not breathing, call 9–1–1.

. . . .

Q: After she left the room where Parker was and went into the kitchen, how long a period of time did she indicate it was before Josh entered the room and screamed?

A: The way she explained it to me was she checked on Parker, walked in the kitchen, and reached in the cabinet.

---

1. MSBP was first identified by a pediatrician in 1997 and is a medically recognized syndrome.

Josh walked in behind her and screamed, Parker's not breathing, call 9-1-1—however long it takes to get from the living room into the kitchen and reach into a cabinet, a few seconds. And her kitchen was right beside the living room.

Q: So according to Gail Cutro, who was the last person who had contact with your son Parker before Josh Cutro found him not breathing?

A: Gail.

After an autopsy, the coroner's office reported Parker's cause of death as Sudden Infant Death Syndrome, or "SIDS," which is the diagnosis given when an infant's cause of death cannot be identified. Dr. Daniel, who performed the autopsy, did note the presence of petechial hemorrhages in the cortical section of Parker's brain which she testified was unusual in a SIDS case.

In July 1994, Parker's body was exhumed and re-autopsied. Dr. Ophoven, who reviewed the autopsy report, concluded that the presence of the petechial hemorrhages in Parker's brain and a sub-dural hematoma, which had not been discovered in the original autopsy, indicated Parker died a traumatic death caused by shaking and asphyxia. Dr. Gilbert–Barness testified that Parker died of Shaken Baby Syndrome which damaged the medulla causing the heart and respiration to stop.

Other medical testimony indicated that Shaken Baby Syndrome can occur with no external sign of trauma. Because a baby's brain is not fully developed, violent shaking damages the vital center of the brain that controls breathing which can cause death by asphyxiation. The presence of petechial hemorrhages indicates asphyxia. Expert testimony further indicated that the symptoms of Shaken Baby Syndrome manifest immediately after the shaking—head injury occurs within seconds and a baby might die immediately.

### Asher Maier

Asher Maier was four months old when he began daycare with the Cutros on June 7, 1993. A couple of days after beginning daycare, Asher became irritable and stopped sleeping through the night. He was fussy on June 23 when his mother dropped him off at the Cutros' at about 7:30 a.m. Between 10:30 and 10:50 a.m., Mrs. Maier received a tele-

phone call at work from appellant stating that the baby was "inconsolable" and suggesting she pick him up and take him to the doctor. When Mrs. Maier arrived at the Cutros' a short time later, the baby was already in his car seat and they immediately handed him to her. Asher remained in his car seat until he was in the doctor's office. When Mrs. Maier removed him, she discovered Asher was limp and unable to control his neck. Another child's parent had seen Asher that morning in daycare and testified he was moving normally at that time.

Dr. Alexander, who reviewed Asher's medical records, testified in his opinion Asher had been the victim of two shaking episodes. An MRI and CT scan revealed old and new blood in his brain indicating an earlier episode, probably two weeks previous, that had healed to some extent. Asher also exhibited retinal hemorrhages indicative of Shaken Baby Syndrome.

### Ashlan Daniel

Ashlan Daniel was about two months old when she began daycare with the Cutros in June 1993. Ashlan was in daycare for about only two hours a day while Mrs. Daniel worked part-time. On September 9, 1993, Mrs. Daniel dropped Ashlan off at the Cutros' at noon. A picture of Ashlan taken earlier that day shows she was a healthy and normal baby, a description her parents corroborated.

When Mrs. Daniel left work at 2:30 p.m., she went to pick Ashlan up at the Cutros' home. She pulled up as EMS personnel were arriving. Josh Cutro came out of the house and told Mrs. Daniel that Ashlan was dead.

Ashlan's mother testified that appellant told her that she, appellant, found Ashlan not breathing and Josh was out of the house at that time. Another parent testified appellant told her Josh went to pick up their children from school and that she, appellant, was the only adult in the room when Ashlan stopped breathing.

Other parents of the Cutros' daycare children also testified. One parent testified Josh told her he had just returned home when appellant came outside to tell him about the baby. Another testified that appellant told her that she, appellant, "was in the room with Ashlan when she died ... and that she

couldn't believe that she didn't notice that [Ashlan] had stopped breathing."

Dr. Reynolds, who autopsied Ashlan's body, testified petechial hemorrhages were present in her brain, which he had never seen in a SIDS death. Because he could not determine the cause of death, he concluded it was SIDS.

Ashlan's body was exhumed and re-autopsied in July 1994. Dr. Ophoven testified that Ashlan's brain had a subdural hematoma which, in addition to the petechial hemorrhages, indicated she had died of trauma and asphyxia. Dr. Gilbert–Barness concurred and stated that these injuries indicated Shaken Baby Syndrome.

## Evidence of MSBP

As proof of motive, the State introduced evidence of appellant's attention-seeking behavior regarding the purported SIDS deaths of the two infants who died in her daycare. She kept their obituaries, photos, and items of clothing, as well as frequently visiting their gravesites and emotionally discussing their deaths repeatedly with others. Appellant also fabricated that she had lost one of her own children and that a baby had died in her care in 1992. The State's medical experts opined that the injuries to the three infants and appellant's behavior indicated a pattern of child abuse identified as MSBP.

## ISSUES

1. Was appellant unfairly prejudiced by the trial court's refusal to sever the charges?
2. Was appellant unfairly prejudiced by evidence used to prove MSBP?
3. Were autopsy reports of other infants improperly admitted?

## DISCUSSION

### 1. Joinder of charges

Appellant was first tried in 1994 and convicted of killing Ashlan Daniel. We reversed that conviction because evidence of the death and injury to the other two infants,

Parker Colson and Asher Maier, was not clear and convincing and therefore was improperly admitted as *Lyle*[2] evidence. *State v. Cutro*, 332 S.C. 100, 504 S.E.2d 324 (1998) (*Cutro I*).[3] Appellant contends the trial judge erred in denying her motion to sever the charges in this case based on our holding in *Cutro I*. For the reasons set forth below, we find our evidentiary ruling in *Cutro I* is not controlling here.

Generally, when offenses charged in separate indictments are of the same general nature involving connected transactions closely related in kind, place, and character,[4] the trial judge has the discretion to order the indictments tried together, but only so long as the defendant's substantive rights are not prejudiced. *State v. Sullivan*, 277 S.C. 35, 282 S.E.2d 838 (1981); *State v. Williams*, 263 S.C. 290, 210 S.E.2d 298 (1974); *McCrary v. State*, 249 S.C. 14, 152 S.E.2d 235 (1967). We have found prejudice where the defendant was jointly tried on charges for which the evidence would not otherwise have been admissible under *Lyle*. *State v. Smith*, 322 S.C. 107, 470 S.E.2d 364 (1996). We now clarify that in determining joinder, the trial judge need not find clear and convincing evidence of the charges.

*a. Distinction between evidentiary and joinder context*

In the context of evidentiary law, *Lyle* and its progeny protect a defendant from the unrestricted admission of bad act evidence. *Lyle* prohibits such evidence unless the evidence has a particular relevance to the crime charged and falls within at least one of five categories: motive, identity, common scheme or plan, absence of mistake or accident, or intent.[5] Further, bad acts that are not the subject of convic-

---

2. *State v. Lyle*, 125 S.C. 406, 118 S.E. 803 (1923).

3. Appellant was retried in 1999; that trial ended in a mistrial when the jury could not agree. This is appellant's third trial.

4. Here, the State produced evidence each offense involved the violent shaking of an infant at the Cutro's home daycare with the intent of promoting sympathy for the caregiver from the resulting injury to the child. These offenses are closely related in kind, place, and character as required to support joinder.

5. *See also* Rule 404(b), SCRE (codifying *Lyle* categories).

tion must be proved by clear and convincing evidence. *State v. Wilson*, 345 S.C. 1, 545 S.E.2d 827 (2001). This preliminary fact-finding by the judge ensures the evidence is subjected to some procedural safeguard before the jury hears it.

■ In the context of the joinder of charges for a jury trial, however, procedural safeguards are already in place that eliminate the need for preliminary fact-finding by the trial judge. Before a defendant is tried on joint charges, the charges are investigated by law enforcement and subject to judicial procedures such as indictment and preliminary hearing. In this procedural context, it is unnecessary to hold a "mini-trial" for the State to prove each charge to the judge before proceeding with a joint trial to the jury. *Accord Solomon v. State*, 101 Md.App. 331, 646 A.2d 1064 (1995) (Moylan, J.).

■■ Further, in the evidentiary context, bad act evidence that falls within a *Lyle* exception and meets the clear and convincing standard may still be excluded if the danger of unfair prejudice substantially outweighs the probative value of the evidence. *State v. Braxton*, 343 S.C. 629, 541 S.E.2d 833 (2001). Similarly, in the joinder context, the defendant may argue unfair prejudice if, after the State's case, the trial judge determines that a directed verdict should be granted. The standard for submission of charges to the jury is "any substantial evidence." *State v. Johnson*, 334 S.C. 78, 84, 512 S.E.2d 795, 798 (1999). If the trial judge finds there is no substantial evidence to submit any one of the joined charges to the jury, the defendant may move for a mistrial on the basis of unfair prejudice resulting from joinder.

### b.  Application of joinder standard

Here, according to the State's case, all three offenses are similar in kind, place, and character—each involves Shaken Baby Syndrome inflicted on an infant in the Cutros' daycare. These offenses clearly fit within the *Lyle* categories for common scheme or plan and motive. We conclude the charges were properly tried jointly.

## 2. Evidence of MSBP

■ Appellant contends evidence concerning the memorabilia seized from her home regarding the two dead infants was unfairly prejudicial and improperly admitted at trial. The State introduced the babies' memorabilia as indicative of MSBP which is marked by attention-seeking behavior. The trial judge charged the jury that it was to consider the diagnosis and evidence of MSBP only for the limited purpose of establishing motive or absence of illness, mistake, or accident.

Appellant claims exclusion of this evidence is mandated under *State v. Nelson*, 331 S.C. 1, 501 S.E.2d 716 (1998), which held that "propensity evidence" is inadmissible. We find *Nelson* distinguishable. In that case, children's toys, videos, photographs of young girls, and other evidence tending to depict the defendant as a pedophile were admitted at his trial for criminal sexual conduct and committing lewd acts on a minor. We held this evidence should have been excluded because character evidence is not admissible "for purposes of proving that the accused possesses a criminal character or has a propensity to commit the crime with which he is charged." *Nelson*, 331 S.C. at 6, 501 S.E.2d at 719.

In this case, the evidence is not general propensity evidence but indicates appellant's behavior regarding the deaths of these two infants. Since the State's theory of the case was that appellant killed the victims to gain sympathy and attention for herself, this evidence is relevant to show motive. *See State v. Hocevar*, 300 Mont. 167, 7 P.3d 329 (2000) (evidence of MSBP admissible on issue of motive). Further, in *Nelson* the evidence was admitted simply to depict the defendant as a pedophile. There was no expert testimony relating the contested evidence to the charges as in this case.

Finally, collecting memorabilia of a deceased child, while perhaps uncommon, is not behavior that itself indicates a bad character. In fact, appellant presented extensive evidence that her grief was a normal response to the deaths of these children. This evidence did not unfairly suggest that appellant had a propensity to commit crimes against children. *See State v. Alexander*, 303 S.C. 377, 382, 401 S.E.2d 146, 149 (1991) (evidence is unfairly prejudicial if it has an undue

tendency to suggest decision on an improper basis). We conclude appellant was not unfairly prejudiced by the admission of this evidence.[6]

### 3. Autopsy reports of other SIDS deaths

■ The State's medical expert, Dr. Ophoven, testified she examined the autopsy reports of all SIDS deaths that occurred under one year of age in South Carolina since 1993. These 274 autopsy reports were marked as State's exhibits for identification during Dr. Ophoven's testimony along with a chart summarizing them. Dr. Ophoven testified that none of these autopsy reports noted petechial hemorrhages of the brain which are considered medical abnormalities that would ordinarily be documented in the course of an autopsy. She testified that the autopsies of Parker Colson and Ashlan Daniel were the only two in which such abnormalities were found, confirming her earlier observation that petechial hemorrhages do not occur in a SIDS death.

Appellant contends evidence concerning the autopsy reports of these other SIDS deaths was irrelevant, was inadmissible hearsay, and violated her confrontation rights.

■ Evidence is relevant if it tends to make the existence of any fact at issue more or less probable. *State v. Frazier*, 357 S.C. 161, 592 S.E.2d 621 (2004); Rule 404, SCRE. Here, medical testimony created an issue regarding the significance of petechial hemorrhages in determining the cause of death of the two infants. The fact that autopsies of SIDS deaths did not note this type of brain abnormality was relevant in distinguishing a SIDS case from a traumatic death.

■ Further, autopsy reports are not hearsay under Rule 803, SCRE. Subsection (8) of this rule excepts from hearsay public records and reports containing matters there is a duty to report. Autopsies are required in cases of SIDS if law enforcement deems it necessary. S.C.Code Ann. § 17–5–540

---

6. Appellant's brief mentions the funeral bulletin for the Lightfoot child, a baby who died of SIDS while in the care of another home daycare provider known to appellant through her church. This evidence also directly related to the case at hand. The State sought to establish that appellant knew about the outpouring of sympathy for the other daycare worker and this motivated her own behavior.

(2003) and § 20–7–5915 (Supp.2004). Additionally, subsection (9) of Rule 803 specifically exempts from hearsay records of vital statistics, including "reports . . . of . . . deaths . . . if the report thereof was made to a public office pursuant to requirements of law." Autopsy reports are required to be kept by the medical examiner's office. S.C.Code Ann. § 17–5–280 (2003). Accordingly, an autopsy report is not inadmissible hearsay.

In addition, Rule 703, SCRE, specifically provides:

The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.

We conclude evidence of the autopsy reports was admissible under the Rules of Evidence.

■■■ Finally, in *Crawford v. Washington*, 541 U.S. 36, 54, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), the United States Supreme Court noted the hearsay exception for business records and observed that business records are not "testimonial" and therefore do not implicate the Confrontation Clause. A public record, very much like a business record, is not testimonial and its admission similarly does not violate the defendant's confrontation rights. Moreover, appellant was able to cross-examine Dr. Ophoven regarding the possible inaccuracies in these autopsy reports and presented extensive expert testimony reinterpreting the significance of their findings.[7] We find appellant's confrontation rights were not infringed.

We hold the trial judge did not err in allowing Dr. Ophoven's testimony regarding the autopsies of other deaths.

## CONCLUSION

Appellant's remaining issues are without merit and are disposed of pursuant to Rule 220(b), SCACR, and the follow-

---

7. Dr. Sexton, who performed several of these autopsies, testified that some showed microscopic brain vessel damage similar to that seen in Parker Colson and Ashlan Daniel.

ing authority: Issue 4: *State v. Taylor*, 333 S.C. 159, 508 S.E.2d 870 (1998) (for this Court to reverse based on erroneous exclusion of evidence, prejudice must be shown; error is harmless when it could not reasonably have affected result of the trial); *State v. Beckham*, 334 S.C. 302, 513 S.E.2d 606 (1999) (any error in exclusion of cumulative evidence is harmless); Issue 5: *State v. Johnson*, 334 S.C. 78, 512 S.E.2d 795 (1999) (if there is any substantial evidence tending to prove the guilt of the accused, or from which guilt may be fairly and logically deduced, the case should be submitted to the jury); *State v. Brown*, 360 S.C. 581, 602 S.E.2d 392 (2004) (on appeal from denial of directed verdict, this Court must view the evidence in light most favorable to the State); Issue 6: *State v. Hyder*, 242 S.C. 372, 131 S.E.2d 96 (1963); *State v. Caulder*, 287 S.C. 507, 339 S.E.2d 876 (Ct.App.1986) (no error to refuse a charge on mere suspicion where the charge adequately instructs the jury regarding reasonable doubt); Issue 7: *State v. Mitchell*, 362 S.C. 289, 608 S.E.2d 140 (Ct.App.2005) (involuntary manslaughter is not a lesser included offense of homicide by child abuse under the elements test); Issue 8: *State v. Pauling*, 322 S.C. 95, 470 S.E.2d 106 (1996) (if jury asks for further explanation of the law after indicating deadlock, the requirements of § 14–7–1330 are met).

**AFFIRMED.**

TOAL, C.J., WALLER and BURNETT, JJ., concur.
PLEICONES, J., dissents in a separate opinion.

Justice PLEICONES, dissenting:

I respectfully dissent. As I understand appellant's joinder argument, she contends that the charges were improperly consolidated for trial. I agree, and would reverse on this ground.

The general rule is that the trial judge has discretion to order separate charges to be tried together over the defendant's objection where the offenses charged "are of the same general nature, involving connected transactions closely related in kind, place and character...." [1] *State v. Sullivan*, 277

---

1. I disagree with the majority that the test for joinder is the same as the standard for admitting prior bad act evidence under *State v. Lyle*, 125 S.C. 406, 118 S.E. 803 (1923)/Rule 404(b), SCRE.

S.C. 35, 43, 282 S.E.2d 838, 843 (1981); *cf., State v. Evans,* 112 S.C. 43, 99 S.E. 751 (1919) (no abuse of discretion in trial judge's denial of defendants' motion to try two murder charges together). Once a court determines that charges may properly be joined, it must then consider whether it should decline to consolidate the claims in order to protect the defendant's right to a fair trial. *Id.* (joinder is improper where the defendant can demonstrate that his substantive rights would be violated by such a procedure); *see also State v. Smith,* 322 S.C. 107, 470 S.E.2d 364 (1996); *State v. Williams,* 263 S.C. 290, 210 S.E.2d 298 (1974); *McCrary v. State,* 249 S.C. 14, 152 S.E.2d 235 (1967). As we have long recognized, "Circumstances might arise which would render a uniting of several counts unjust to the defendant." *City of Greenville v. Chapman,* 210 S.C. 157, 162, 41 S.E.2d 865, 867 (1947). Even where joinder is permissible, the trial court must be mindful of protecting the defendant's right to a fair trial because "[b]y the multiplication of distinct charges, the prisoner may be confounded in his defense, or prejudiced in his challenges, or the attention of the jury may be distracted." *Id.* (internal citations omitted).

In this case, the first issue is whether the trial judge abused his discretion in finding a relationship sufficient to permit the State to try appellant on three charges at a single trial: the homicide of Parker Colson on January 4, 1993; the injury to Asher Maier discovered on June 23, 1993; and the homicide of Ashlan Daniel on September 9, 1993. In my opinion, while these charges are of the same general nature, they do not involve "connected transactions closely related in kind, place and character" as these terms are defined by our case law. Crimes which do not arise out of a "single chain of circumstances" and which require "different evidence for proof" "clearly fail[ ] to meet the requirements for consolidation." *State v. Middleton,* 288 S.C. 21, 23, 339 S.E.2d 692, 693 (1986) (reversing where charges of rape and murder of one victim, rape and murder of a second victim the next day, and attempted robbery and assaults on the day after were consolidated for trial). I would hold the trial judge committed reversible error in allowing these three charges to be tried together over

appellant's objection, as they did not arise out of a single chain of circumstances and required different proof.[2]  *Id.*

I would reverse appellant's convictions and remand the matter for further proceedings.

---

**2.** Even if I were to find these charges were sufficiently connected so as to be subject to consolidation, I would hold that joinder should have been denied in order to protect appellant's right to a fair trial.  *City of Greenville v. Chapman, supra.*