Laurie Lea WILLIAMSON, Appellant,

v.

The STATE of Texas, Appellee.

Nos. 01–08–00365–CR, 01–08–00366–CR.

Court of Appeals of Texas,
Houston (1st Dist.).

May 6, 2010.

Discretionary Review Refused
Sept. 29, 2010.

Roland Brice Moore III, Houston, TX, for Appellant.

Kenneth Magidson, Harris County District Attorney, Carol M. Cameron, Assis-

tant District Attorney, Houston, TX, for Appellee.

Panel consists of Chief Justice RADACK and Justices ALCALA and HIGLEY.

## OPINION

LAURA CARTER HIGLEY, Justice.

These two appeals involve allegations that the complainant, C.W., was the victim of medical child abuse, sometimes referred to as Munchausen Syndrome by Proxy, perpetrated by his mother, appellant, Laurie Lea Williamson. The bases for the criminal charges against appellant are two surgical procedures performed on C.W. in 2001, when he was five and six years old. The State offered evidence at trial to show that the surgeries were not medically necessary and that appellant knowingly and intentionally caused the unnecessary procedures to be performed by fabricating, exaggerating, and inducing the symptoms leading to the surgeries.

Following a joint trial on two separate indictments, a jury found appellant guilty of two first-degree felony offenses of injury to a child, as alleged in each indictment. *See* TEX. PENAL CODE ANN. § 22.04(a)(1), (c)(1), (e) (Vernon Supp. 2009).[1] Because each indictment alleged that appellant had caused C.W. serious bodily injury by "cutting him with a deadly weapon, namely, a scalpel," the trial court included in each judgment an affirmative deadly-weapon finding. The jury assessed punishment at 15 years' imprisonment for each offense, with the sentences to run concurrently. Appealing each judgment of conviction, appellant raises seven identical issues in each appeal.

We affirm the judgment in each appellate cause.

## Background

Appellant and her husband had two sons: the complainant, C.W., born on March 16, 1995, and D.W., born on May 21, 1997. They also had one daughter, L.W., born on September 1, 1999. After L.W. was born, appellant divorced the children's father and became the children's primary care giver.

By the time he was five years old, C.W. already had been diagnosed with a number of medical problems, including Crohn's disease, which is an intestinal disorder, Tourette's Syndrome, attention deficit hyperactivity disorder, and obsessive compulsive disorder. C.W. took a number of medications for these afflictions.

Appellant also reported to C.W.'s doctors that C.W. suffered from "staring spells," in which C.W. would stare, "zone out," and be non-responsive. After these spells, appellant claimed that C.W. would often fall asleep and lose bladder control. These episodes reported by appellant were diagnosed as "partial complex seizures," a form of epilepsy.

For his seizures, C.W. was referred to Dr. Balbir Singh, a neurologist, who specializes in pediatric epilepsy. During C.W.'s first visit, Dr. Singh noticed that C.W. appeared to be "doped up" or overmedicated. C.W. was drowsy and unsteady on his feet. Dr. Singh ordered a blood test, which revealed that C.W. had levels of Dilantin, an anti-seizure medication, at twice the recommended level.

Dr. Singh tried to control C.W.'s seizures with medications. Appellant continued to report to the doctor that C.W.

---

1. Penal Code section 22.04 has been amended by the legislature since the date of the offenses, but the changes do not affect our analyses. For ease of reference, we cite the most recent versions of the statutes.

experienced seizures. Several medical tests were performed on C.W., including electroencephalography (EEG) tests. An EEG is an electrical test of the brain, which can aid in determining whether a person has seizure activity.

The EEG tests performed on C.W. were not definitive. At least one of the tests indicated abnormal "generalized epileptic form activity," which showed a correlation with seizure activity. Other EEG tests performed on C.W. indicated no abnormal activity. Dr. Singh had a video EEG performed on C.W. over a 23–hour period. During that period, appellant reported that C.W. had three or four seizures, but none were recorded on the EEG.

Despite the fact that Dr. Singh had C.W. on the maximum dosages for anti-seizure medications, appellant reported that C.W. continued to have up to 11 seizures a day. Based primarily on appellant's report of the continued seizure activity, Dr. Singh referred C.W. to a surgeon for the implantation of a vagal nerve stimulator, a device that can decrease seizure activity when medications have failed. At trial, Dr. Singh testified that the vagal nerve is the nerve that runs from the brain to the stomach. With regard to the procedure, the doctor explained that the vagal nerve stimulator is a device that "can be inserted just under the skin . . . and then a wire goes from the device to the nerve" and "then winds around the nerve." He continued, "[T]he device stimulates the nerve every one minute or every 10 minutes. We can program the device from the outside." Dr. Singh further explained that "we can change the settings of the [vagal nerve stimulator] device to give the shocks at different times and different strengths."

A surgeon, Dr. James Baumgartner, implanted the vagal nerve stimulator on January 5, 2001. Dr. Singh set the vagal nerve stimulator at different strengths but the device did not stop the seizures, according to appellant. The device was deactivated six weeks after it was implanted and was never reactivated. Appellant continued to report that C.W. suffered from seizures.

C.W. was hospitalized in February 2001 with a "failure to thrive" diagnosis, which meant that C.W. was not growing properly. A pediatric surgeon, Dr. Paul Minifee, surgically placed a central line into C.W.'s subclavian vein to provide C.W. nutrition. While he was hospitalized, C.W. was seen by many specialists from several disciplines, including neurology, endocrinology, hematology, oncology, and genetics. A concern was raised by the neurology team that perhaps C.W. was a victim of Munchausen Syndrome by Proxy by appellant. The doctors had a child protection meeting, and it was decided that they did not have enough evidence to make a Munchausen Syndrome by Proxy diagnosis.

Prior to C.W.'s discharge from the hospital, Dr. Minifee placed a nasal gastric feeding tube through C.W.'s nose, down his throat, and into his stomach. The purpose of the tube was for C.W. to be fed liquid formula.

Around this time period, others also had concerns for C.W.'s welfare. When C.W. was in preschool, he was a happy, spunky, smart preschooler. C.W. continued to kindergarten at the same school, and C.W.'s teachers began to notice a change in him.

Appellant told the school that C.W. was on a special, restricted diet. The teachers noticed that C.W. was very thin and losing weight. At trial, C.W.'s teacher said that he was "just skin and bones." C.W. always seemed hungry and craved food. However, the teachers could not give C.W. food because of his dietary restrictions.

The teachers also noticed C.W. appeared very tired. C.W. would, at times, have to

lay down in the nurse's office. C.W.'s teachers were concerned that he was being over-medicated. C.W. also appeared to be regressing intellectually.

In November 2000, one of C.W.'s teachers, the school psychologist, and the school nurse drafted a letter that they planned to send to C.W.'s doctors. The letter detailed their concerns regarding C.W. and requested the doctors' assistance. The teachers were concerned that appellant was abusing C.W. In the letter, they stated their observations and expressed concerns regarding C.W.'s weight and his medication. When confronted with the concerns, appellant withdrew C.W. from public school to home school him. The letter to C.W.'s doctors was never sent.

Appellant's neighbors, who babysat C.W., also had concerns. Appellant told the neighbors that C.W. was on a restricted diet. Appellant provided the food for C.W. to eat while staying at the neighbor's house, which was bland and unpalatable. The neighbors were concerned because C.W. was emaciated and lethargic. He would beg for food from the time appellant dropped him off until the time she picked him up.

In November 2001, appellant took C.W. to see Dr. Minifee. The purpose of the visit was for the doctor to evaluate whether C.W.'s nasogastric feeding tube should be replaced by a gastrostomy feeding tube. Appellant told Dr. Minifee that C.W. had a "feeding disorder" and hypotonia, which is decreased muscle tone. Appellant reported that C.W. could not hold himself up or walk comfortably.

Appellant also expressed concern to Dr. Minifee that C.W. had mitochondrial disease, which is a genetic disorder. On December 11, 2001, Dr. Minifee surgically placed a gastrostomy tube through C.W.'s abdomen into his stomach.

While C.W. was under general anesthesia, Dr. Minifee also took a sample of muscle tissue from C.W.'s leg to be tested for mitochondrial disorder. Testing on the muscle sample revealed a negative finding for mitochondrial disorder. Despite the negative finding, appellant continued to represent to others that C.W. had mitochondrial disorder.

C.W. eventually began using a wheelchair. Although he had been potty trained at the age of two, C.W. became incontinent of bowel and bladder.

On January 10, 2006, C.W.'s pediatrician wrote a letter, at appellant's request, "to whom it may concern." The pediatrician was also the primary physician for C.W.'s siblings. The January 10, 2006 letter detailed each child's medical history. With regard to C.W., the doctor wrote the following:

[C.W.] is an almost eleven-year-old patient with multiple medical problems including mitochondrial disorder, metabolic disorder, neurological regression syndrome, global development delay, seizure disorder, hypotonia, status post history of failure to thrive, gastrointestinal malabsorption, gastroesophageal reflux, esophagitis, status post gastric-button placement, hypothyroidism, hypotension, urinary incontinence, stool incontinence, heat intolerance due to poor thermoregulation from the metabolic disease state, attention deficit/hyperactivity disorder, Tourette's syndrome, decreased acoustic reflexes in the right ear, obsessive-compulsive disorder, anxiety disorder, pragmatic language disorder, decreasing IQ scores, sensory integration disorder, auditory processing disorder and poor immune function.

It is medically necessary for [C.W.] to have G-button [tube] feedings for his malabsorption and failure to thrive, dia-

pers for his incontinence, and a wheelchair.

Appellant's other two children also had numerous medical problems diagnosed over the years. Soon after L.W. was born, appellant reported to her pediatrician that L.W. was experiencing episodes during which L.W. would become cyanotic, turning blue. As a newborn, this led to L.W.'s hospitalization on a couple of occasions.

When she was a newborn, it was determined that L.W. had difficulty swallowing. As a result, L.W. also had a gastrostomy feeding tube surgically implanted in her stomach. L.W. also began missing milestones as a baby with regard to physical and cognitive development. By the age of three, L.W. still was not walking or talking and was very small for her age. L.W. used a wheelchair and wore metal leg braces. Appellant represented to others, including doctors, that L.W. also had mitochondrial disorder.

In the January 10, 2006 letter, the children's pediatrician described L.W. as follows:

> [L.W.] is a six-year-old patient with multiple medical problems including mitochondrial disorder, metabolic disorder, neurological regression syndrome, global development delay, scoliosis, hypotonia requiring leg braces, status post history of failure to thrive, congenital laryngeal abnormality (she has been unable to take any medications or foods per moth, everything must be given via her G-button [feeding tube], no exceptions!), gastrointestinal malabsorption, gastroesophageal reflux, status post Nissan fundoplication and gastric-button placement, vesicoureteral reflux, poor bladder function, urinary incontinence, stool incontinence, short stature, bilateral hip subluxation, bilteral coxa valga, osteopenia, heat intolerance due to poor thermoregulation from the metabolic disease state, attention deficit/hyperactivity disorder, sensory integration disorder, auditory processing disorder, photophobia, lack of safety awareness and poor immune function. She is also extremely susceptible to aspiration pneumonia. It is medically necessary for her to have her wheelchair, gait trainer, supplemental oxygen, pulse oximeter monitor, Posey bed, suction machine and cough assist machine.

Appellant's middle child, D.W. had fewer medical diagnoses than C.W. and L.W. But, similar to C.W. and L.W., appellant maintained that D.W. had mitochondrial disorder.

In the January 10, 2006 letter, the pediatrician offered the following regarding D.W.:

> [D.W.] is an almost nine-year-old patient with mitochondrial disorder, metabolic disorder, neurological regression syndrome, global development delay, hypotonia, gastrointestinal malabsorption, gastroesophageal reflux, swallowing dysfunction with thin liquids, allergic rhinitis, irritable bowel syndrome, nocturnal enuresis, heat intolerance due to poor thermoregulation from the metabolic disease state, attention deficit/hyperactivity disorder, obsessive-compulsive disorder, severe mood swings, sensory integration disorder, auditory processing disorder and poor immune function.

The January 10, 2006 letter further stated, "It is medically necessary for all three of the above-mentioned children to have occupational, speech and physical therapy."

The occupational, speech, and physical therapists that came to appellant's home over the years to treat the children also had concerns for their welfare. At trial, one or more of the therapists gave testimony indicating (1) C.W. and D.W. appeared

to be "starving" and were not receiving adequate nutrition; (2) appellant did not provide the children with sufficient stimulation, did not appear to be consistently home schooling the kids, and limited the children's growth and independence; (3) appellant kept the house very cold and dark at all times; (4) appellant limited the amount of outside play for the children; (5) appellant would not allow L.W. to be potty trained and wanted L.W. to stay in her wheelchair; (6) appellant focused on the children's deficits and would become upset when a therapist reported any progress; (7) appellant would tell others in the children's presence that they had mitochondrial disorder and would not live beyond their teenage years; and (8) the children believed, from what appellant had said, that they were going to die.

In March 2005, appellant began to have a series of health problems of her own and became unable to care for her children. A home health nurse and volunteers, who were from appellant's church, the home school community, and other friends, started coming into appellant's home to care for the children around the clock. Appellant was bedridden for a number of months and ultimately required a wheelchair.

During this time when others were caring for the children, the children's health dramatically improved. For example, L.W. grew significantly. She went from wearing a size 2T to wearing a size 5T in a five-month time period. L.W. was also walking and generally gaining her health. C.W. and D.W. also were gaining weight. Like L.W., the two boys were able to do things that appellant had claimed that they never could do. The boys seemed happier and much healthier.

The children's dramatic improvement caught the attention of Darcy Wall, the wife of appellant's pastor and appellant's friend. Wall had aided and supported appellant over the years. The children's improvement while in the care of others made Wall realize that appellant had not been truthful about the children's medical conditions. Wall became concerned about the children's safety and contacted Children's Protective Services (CPS) in October 2005. However, CPS took no action at that time.

Wall also contacted Susan Owen, a nurse and close friend of appellant. Owen had also helped appellant significantly over the years with the children. At that time, Owen had not seen the children for several months. Owen went to appellant's home and saw the dramatic improvement of the children. Owen spoke with the children's speech, physical, and occupational therapists. From what she learned, Owen also became concerned about the children's well being. Ultimately, on February 28, 2006, Owen and Wall made a report of child abuse to the Harris County Constable. The constable's office contacted CPS, and the children were removed from appellant's home on March 16, 2006.

After the removal, the three children were placed in the temporary custody of their maternal grandmother. The children spent three weeks with their grandmother and then were admitted to Texas Children's Hospital for an evaluation.

Upon admission, 11–year–old C.W. had multiple diagnoses, including mitochondrial disorder, seizures, food allergies, and Crohn's diseases. The vagal nerve stimulator and the gastrostomy feeding tube were still in place. C.W. wore bifocal glasses and was in a wheelchair. C.W. was taking nine or ten medications. He was incontinent and wearing diapers.

The medical team at the hospital developed a plan for C.W. He was allowed to eat regular food and his medications were greatly decreased. C.W.'s eyes were ex-

amined, and it was determined that he did not need glasses. C.W. was evaluated by a physical therapist, who determined that he did not need the wheelchair. C.W. also was trained to use the toilet.

It was also determined that C.W. could eat orally and did not need the gastrostomy feeding tube. The tube was removed by the same surgeon, Dr. Minifee, who had placed it over four years earlier. It was further determined that the vagal nerve stimulator would remain in place, even though it had not been activated for years. Removing the device would involve major surgery. C.W. had no seizure activity while he was hospitalized.

C.W. was discharged three days after being admitted. At that time, he had no gastrostomy feeding tube, no glasses, no wheelchair, and fewer medications.

D.W. and L.W. also had similar results from the hospital evaluation. It was determined that six-year-old L.W. did not need a gastrostomy feeding tube, despite the fact that she had never eaten by mouth her entire life. Therapists taught her how to chew and swallow.

L.W. also did not need a wheelchair or leg braces. She did not need an oxygen tent on her bed at night, as had been reported. Neither she nor D.W. needed the glasses that they wore. Both D.W. and L.W. wore diapers. During their hospitalization, both responded well to incontinence training. L.W. was taking eight or nine medications. On discharge, L.W. only needed one medication, a laxative. D.W.'s medications were also significantly reduced.

Blood and chromosomal tests were conducted on the children. The tests came back negative for mitochondrial abnormalities. A geneticist determined that it was very unlikely that the children had mitochondrial disorder because they showed progress and advancement. Mitochondrial disorder is characterized by regression and deterioration.

The children continued to improve after their discharge from the hospital. L.W. went to live for five months with a family friend. During that time, L.W. could do anything that a normal children could do. She could ride a two-wheel bike, ski, jump rope, swim, dribble a basketball, ride a horse, and climb a rock wall. L.W. had a hearty appetite, and would eat anything. Her favorite foods included pizza, spaghetti, and steak.

Appellant was ultimately charged with two first-degree offenses of serious bodily injury to C.W. The offenses arose from the vagal nerve stimulator surgery on January 5, 2001 and the gastrostomy tube surgery on December 11, 2001. With respect to each offense, the indictments alleged that appellant "unlawfully, intentionally, and knowingly cause[d] serious bodily injury to [C.W.], a child younger than 15 years of age, by cutting him with a deadly weapon, namely, a scalpel."

At a pretrial hearing, the defense objected to the admission of D.W.'s and L.W.'s medical records and testimony relating to the medical records. The defense asserted that the evidence constituted extraneous offense evidence that was inadmissible under Rules of Evidence 403 and 404(b). The trial court overruled the objections and allowed the admission of the evidence pertaining to C.W.'s siblings.

At trial, the State alleged that C.W. had been the victim of medical child abuse, also known as Munchausen Syndrome by Proxy, perpetrated by appellant. A number of medical experts testified that all three children had been victims of Munchausen Syndrome by Proxy by appellant.

One of the State's medical experts was Dr. Jeanine Graf. She was the attending

physician while the children were hospitalized at Texas Children's Hospital. Dr. Graf testified as an expert on Munchausen Syndrome by Proxy.

Dr. Graf told the jury that Munchausen Syndrome by Proxy is "where an alleged perpetrator ... attempts to gain [sic] medical procedures and issues for her child for secondary gain for themselves.... [A]s a result, the children are subjected to multiple diagnostic tests, therapeutic procedures, sometimes operative procedures, in order to treat things that really aren't there."

Dr. Graf, and also a number of other doctors who testified at trial, explained that physicians working in pediatric medicine rely heavily on parents to provide information regarding their children. As a result, a child's diagnosis and treatment is often a direct result of the information provided by a parent.

Dr. Graf also explained,

One of the confirmatory diagnostic tests for the syndrome of Munchausen by Proxy is that when you remove the child, or the victim, from the alleged perpetrator, all of the medical problems go away. And so, that was part of the plan, to see if the children [here] could be removed from all of their therapies and they could continue to do well and to thrive.

Another of the State's experts on Munchausen Syndrome by Proxy, Dr. Jane Shook, testified, "Medical child abuse is when the caretaker of a child or children falsifies information, visits harm upon a child, does other things in order that a child ends up seeking and receiving medical care, often for the secondary gain of the adult, the supervising adult." When asked what she meant by secondary gain, Dr. Shook explained, "Oftentimes the adult is receiving attention, which is gain all by itself. Sometimes it's because they are somehow receiving money or support or other sorts of material reimbursement."

At trial, the State offered evidence that appellant received financial gain from the children's claimed infirmities. For example, Darcy Wall testified that she calculated the congregation of her church had given appellant approximately $150,000. The children's physical therapist testified,

[Appellant] would tell me how her house note would be paid.... The housekeeper once a week was being paid by someone. People would volunteer to pay for lawn services. People would come in and volunteer to fix the air conditioning and heating system, the computer. Different groups would come in and renovate a room for the children. Her van with the wheelchair access was donated to her by the V.F.W. [A]t Christmastime she would be on many, many church lists. She asked me if I knew of any church lists she could get on. Make–A–Wish foundation provided a trip for her and the family to Disney World.

To receive donations, appellant would portray her children to be more ill than they were. The physical therapist testified, "For the van, [appellant] provided a picture of the children in wheelchairs, even though [C.W.] could walk, and [appellant] commented, 'I need to take more pictures of them in wheelchairs.' "

The evidence also showed that appellant was on public assistance, receiving many medical supplies for the children. The children's occupational therapist testified that appellant had some of these medical supplies, such as diapers and formula for the tube feedings, "stockpiled" in the garage. Appellant told the occupational therapist that she sold the diapers for $20 a box.

At the heart of the State's case was its assertion that appellant had induced, fabricated, and exaggerated C.W.'s symptoms, which led to his surgeries. The State offered evidence from which the jury could have inferred that appellant induced C.W.'s symptoms by under feeding him, over medicating him, and depriving him of an environment in which he could develop.

One of the State's last witnesses was the children's stepmother, Sherry Williamson. She testified that the children had been living with her and their father for approximately 10 months before trial. Williamson testified that the children are healthy and active without any restrictions on their activity levels or diets. They all have healthy appetites, like to eat, and are growing.

Williamson testified that C.W. still takes three medications: one for his ADHD, a mood stabilizer, and a sleeping pill. D.W. was initially taking two medications. At the time of trial, D.W. was taking only one medication, a mood stabilizer, at half the dose he had been taking initially. Williamson testified that it was anticipated that D.W. would soon stop taking the mood stabilizer. L.W. took no medication.

The children had all been generally healthy while living with Williamson. D.W. had been to the doctor once for an ear infection. All three had also had a yearly check-up. Otherwise there were no doctors' visits.

Williamson testified that the children are doing well academically. She stated that C.W. was having some issues coping socially, but he was receiving counseling. In short, Williamson testified that the children are now happy, healthy, normal kids.

Appellant defended against the charges at trial by asserting that she had merely been an overprotective mother, who simply had reported what she observed to the doctors. The defense contended that it was the doctors who had made the diagnoses and the decisions regarding what medical treatment to pursue, including C.W.'s surgeries. In sum, appellant contended that the two surgeries forming the bases of the criminal charges against her consisted of reasonable medical care.

The jury implicitly rejected appellant's defense and found her guilty of both first-degree offenses of injury to a child. Presenting seven identical issues, appellant now appeals each conviction.

## Legal Sufficiency

In her sixth issue, appellant argues that the evidence is legally insufficient to support the judgment of conviction in each case.

### A. Standard of Review

When reviewing the legal sufficiency of the evidence to support a conviction, we determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *See Laster v. State,* 275 S.W.3d 512, 518 (Tex.Crim.App.2009) (citing *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979)). This standard gives full play to the responsibility of the trier of fact to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *See Jackson,* 443 U.S. at 319, 99 S.Ct. at 2789; *Clayton v. State,* 235 S.W.3d 772, 778 (Tex.Crim.App. 2007). When performing a legal-sufficiency review, we "determine whether the necessary inferences are reasonable based upon the combined and cumulative force of all the evidence when viewed in the light most favorable to the verdict." *Hooper v. State,* 214 S.W.3d 9, 16–17 (Tex.Crim.App. 2007).

## B. Law of the Offense

Penal Code section 22.04 provides that a person commits the first-degree offense of injury to a child if she intentionally or knowingly causes serious bodily injury to a child, who is younger than 15 years of age. *See* Tex. Penal Code Ann. § 22.04(a)(1), (c)(1), (e). The statute further provides, "It is a defense to prosecution under this section that the act or omission consisted of … reasonable medical care occurring under the direction of or by a licensed physician." *See* Tex. Penal Code Ann. § 22.04(k)(1).

■ A person can be held criminally liable if an offense is committed by the conduct of another for which the first person is criminally responsible. *See* Tex. Penal Code Ann. § 7.02 (Vernon 2003). In conformity with the Penal Code, the charge in each of the cases here instructed the jury, "[A] person is criminally responsible for an offense committed by the conduct of another if acting with the kind of culpability required for the offense, she causes or aids an innocent or nonresponsible person to engage in conduct prohibited by the definition of the offense." *Id.* § 7.02(a)(1). Circumstantial evidence may be sufficient to show that a person is a party to an offense; and, in determining whether a defendant participated as a party, a court may examine events occurring before, during, and after the commission of the offense. *Leon v. State,* 102 S.W.3d 776, 781 (Tex.App.-Houston [14th Dist.] 2003, no pet.).

## C. Appellate Cause Number 01–08–00365–CR

Appellant's conviction for injury to a child in appellate cause number 01–08–00365–CR arises from the surgery to implant the vagal nerve stimulator on January 5, 2001. Appellant's brief does not clearly identify which elements of the offense she is challenging with respect to this offense. Nor does she analyze the evidence in the light most favorable to the verdict, as required under the applicable standard of review. Instead, appellant focuses on evidence that supports her defensive theory that the implantation of the vagal nerve stimulator consisted of reasonable medical care. She asserts that it was the doctors, not her, who made the decision to implant the device in C.W. Based on her briefing, we construe appellant's issue as challenging the legal sufficiency of the jury's implicit rejection of her defense that implanting the vagal nerve stimulator consisted of reasonable medical care by a licensed physician. *See* Tex. Penal Code Ann. § 22.04(k)(1).

■ When reviewing a legal-sufficiency challenge on the issue of a non-affirmative defense, a reviewing court views the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found (1) the essential elements of the offense beyond a reasonable doubt and (2) against appellant on the defensive issue beyond a reasonable doubt. *See Saxton v. State,* 804 S.W.2d 910, 914 (Tex.Crim.App.1991). Although appellant does not specifically dispute the legal sufficiency of the evidence to show the essential elements of the offense beyond a reasonable doubt, we begin with that analysis. To establish the essential elements of the offense, the State had to prove that appellant intentionally or knowingly caused serious bodily injury to C.W. *See* Tex. Penal Code Ann. § 22.04(a)(1), (c)(1), (e).

■ A person acts intentionally when it is her conscious desire to engage in the conduct or to cause the result. Tex. Penal Code Ann. § 6.03(a) (Vernon 2003). A person acts knowingly with respect to a result of her conduct when she is aware that her

conduct is reasonably certain to cause the result. TEX. PENAL CODE ANN. § 6.03(b) (Vernon 2003). Here, the record shows that appellant knowingly and intentionally provided information to C.W.'s physicians regarding his symptoms, which along with medical testing, led to the implantation of the vagal nerve stimulator. It was the State's theory of the case that appellant fabricated and exaggerated such information. As a result, C.W. was subjected to an unnecessary procedure: the surgical implantation of the vagal nerve stimulator.

Dr. Singh, the pediatric neurologist who referred then five-year-old C.W. to a surgeon for the implantation of the vagal nerve stimulator, testified that he would not have referred C.W. for surgery based on medical testing alone. He stated that he relied heavily on appellant's reports that C.W. continued to have daily seizures despite being on the maximum dosages of anti-seizure medications.

■ Appellant also does not specifically dispute on appeal that the implantation of the vagal nerve stimulator constitutes a "serious bodily injury." The Penal Code defines "serious bodily injury" as "injury that creates a substantial risk of death or that causes death, serious permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ." TEX. PENAL CODE ANN. § 1.07(a)(46) (Vernon Supp. 2009). The evidence showed that the surgeon, Dr. Paul Baumgartner, made an incision in C.W.'s tissue with a scalpel through which the vagal nerve stimulator was connected to C.W.'s vagal nerve, which is near the carotid artery. The record further shows that appellant signed a written consent form, which indicated that the risks for the procedure include "infection, blood clots in veins and lungs, hemorrhage, allergic reactions, and even death." The State pre-

sented expert medical testimony that the surgery constituted serious bodily injury.

■ With regard to her defense, appellant asserts that the evidence showed that the procedure of implanting the vagal nerve stimulator consisted of reasonable medical care. See TEX. PENAL CODE ANN. § 22.04(k)(1). Appellant points to medical tests, specifically, EEG tests, performed on C.W., which Dr. Singh considered abnormal. Testimony was presented that such abnormal EEGs may be indicative that C.W. suffered from seizures. Appellant also cites testimony of a number of witnesses, who, like her, had observed C.W. having "staring episodes." Dr. Singh explained that, with one type of seizure, known as a "complex partial seizure," the afflicted person may stare off into space and appears "zoned out." The person will likely not respond to the calling of his name or to being touched. Dr. Singh explained that the person is actually unconscious, although his eyes are open. Appellant had reported to Dr. Singh that C.W. had approximately 10 of these non-responsive staring episodes a day despite being on strong anti-seizure medications.

Although she asserts a legal-sufficiency challenge, appellant does not appropriately view the evidence in the light most favorable to the verdict in making her argument. The question we must answer is whether, when viewed in the light most favorable to the verdict, does the evidence support the rejection of appellant's reasonable medical care defense beyond a reasonable doubt? See Saxton, 804 S.W.2d at 914.

The record shows that Dr. Singh referred C.W. to Dr. Baumgartner for implantation of the device because appellant reported that C.W. continued to have seizures, even though he was taking the maximum dosages of anti-seizure medication. After the implantation of the vagal nerve

stimulator, appellant continued to claim that C.W. experienced seizures. Dr. Singh testified that he tried different setting strengths for the vagal nerve stimulator to no avail. The evidence showed that the device was deactivated six weeks after it was implanted and was never reactivated. Appellant continued to report that C.W. suffered from seizures until the time he was removed from her care by CPS when he was 11 years old. After he was removed from appellant's care, C.W.'s anti-seizure medication was discontinued. The evidence showed that C.W. had no more seizures following the discontinuation of his anti-seizure medication.

The evidence further showed that, although C.W. had several "abnormal" EEGs, none of the EEGs captured actual seizure activity. C.W. had undergone one EEG that lasted for 23 hours. During this time, appellant reported that C.W. experienced three seizures; however, the EEG did not capture any of these episodes.

The State also offered the testimony of Dr. Joan Shook, a pediatrician, who is Chief of Emergency Medicine at Texas Children's Hospital. Dr. Shook testified that she had expertise in the area of child abuse and had published and testified many times on the subject. Dr. Shook explained that she had reviewed the medical records of C.W. and of his siblings. She also reviewed witness statements.

Based on her review of these records, Dr. Shook testified that the implantation of the vagal nerve stimulator was not necessary. She cited the records showing that, once removed from appellant's care and taken off the anti-seizure medications, C.W. had no more seizures.

In addition, Dr. Singh testified that, based on C.W.'s complete medical history at the time of trial, he would not have recommended the implantation of the vagal nerve stimulator. Given the post-sur-

gical information learned regarding appellant and C.W., Dr. Singh testified that the surgery was not necessary. He agreed that unnecessary surgeries do not constitute reasonable medical care.

After viewing all the evidence in the light most favorable to the verdict, we conclude in appellate cause number 01–08–00365 that a rational trier of fact could have found beyond a reasonable doubt that appellant committed the essential elements of serious bodily injury to a child younger than 15 years of age and could have also found beyond a reasonable doubt that the implantation of the vagal nerve stimulator did not consist of reasonable medical care. We hold that the evidence was legally sufficient to support the judgment of conviction in appellate cause number 01–08–00365–CR.

**D. Appellate Cause Number 01–08–00366–CR**

 Appellant's conviction for injury to a child in appellate cause number 01–08–00366–CR arises from the surgical procedures performed by Dr. Paul Minifee on December 11, 2001. With respect to this offense, appellant offers no cognizable argument to explain how the evidence was insufficient and does not specify which element or elements were not proven. Nor is it apparent that she is challenging the jury's implicit rejection of her defense for this offense. If a party provides no argument or legal authority to support its position, we may properly overrule the issue or point as inadequately briefed. *See* Tex. R.App. P. 38.1(h); *see also Turner v. State,* 4 S.W.3d 74, 80–81 (Tex.App.-Waco 1999, no pet.). Nonetheless, in the interest of justice, we will analyze the evidence to determine whether it is legally sufficient to support appellant's conviction with respect to the gastrostomy tube surgery.

At trial, the State presented its theory that appellant had exaggerated, fabricated, or induced C.W.'s symptoms, such as weight loss and weakness, which led to the gastrostomy tube surgery.[2]

The State offered the testimony of Dr. Minifee, the pediatric surgeon who performed C.W.'s gastrostomy tube surgery. Dr. Minifee testified that he relied on the medical history provided by appellant to make the decision to perform the gastrostomy tube surgery on C.W. Appellant reported to Dr. Minifee that C.W. had a history of "failure to thrive." She suggested to the doctor that C.W. have a gastrostomy tube surgically placed. Appellant told Dr. Minifee that C.W. was getting "weaker and weaker" and was losing weight. Dr. Minifee testified that he relied on appellant's information to be accurate and truthful in making the decision to perform the surgery. At the time, Dr. Minifee believed that the gastrostomy tube surgery was necessary based, in part, on what appellant had told him.

Dr. Minifee also described the gastrostomy tube surgery and the risks associated with the procedure. To insert the gastrostomy tube, Dr. Minifee testified that he made two incisions: one three-centimeter incision through the abdominal wall to reach C.W.'s stomach and a second incision "where the tube actually came through the abdominal wall." The surgery put C.W. at risk for complications such as infection, bleeding, blood clots, allergic reaction, and possible death. Dr. Minifee told the jury that he explained these risks to appellant before appellant consented to the gastrostomy tube surgery.

Dr. Minifee further described that C.W. has two permanent scars from the gastrostomy tube surgery. According to Dr. Minifee, C.W. is at risk for subsequent health problems due to the scarring from the procedure. Dr. Minifee explained that, because of the gastrostomy tube surgery, C.W. is at risk to develop adhesions, which are "a form of scar." The doctor explained that adhesions are the "most common reason for . . . intestinal obstructions" to develop in patients.

Dr. Minifee was also the surgeon who removed the gastrostomy tube from C.W. after he was taken from his mother's care in 2006. Since the tube's removal, C.W. has been able to eat food without difficulty, thrive, and grow. Dr. Minifee testified that, had he known the information regarding C.W.'s history that he now knows, he would not have performed the 2001 surgery. He stated that he now believes that the gastrostomy tube surgery was unnecessary. Dr. Minifee agreed that performing the unnecessary procedure on C.W. caused the child serious bodily injury.

In addition to Dr. Minifee, the State presented expert medical testimony regarding the gastrostomy tube surgery. Based on her review of the medical records, Dr. Shook opined that the surgery had not been necessary. She based her opinion on the fact that C.W. has been growing normally since the tube's removal. Dr. Shook agreed that the gastrostomy

2. The indictment in appellate cause number 01–08–00366–CR alleges that, on December 11, 2001, appellant "unlawfully, intentionally and knowingly cause[d] serious bodily injury to [C.W.] . . ., a child younger than fifteen years of age, by cutting him with a deadly weapon, namely, a scalpel." Surgeon, Dr. Paul Minifee, performed two surgical procedures on C.W. on that date: the gastrostomy tube surgery and a biopsy of muscle tissue from C.W.'s leg to determine whether C.W. had mitochondrial disorder. As pled in the indictment, either procedure could serve as the basis for appellant's conviction. We focus on the evidence submitted regarding the gastrostomy tube surgery in our sufficiency analysis.

tube surgery constituted "bodily injury that creates a substantial risk of death ..., serious permanent disfigurement or protracted loss or impairment of function of any bodily member or organ."

The State also presented the testimony of Dr. Reena Isaac, who is an assistant professor at Baylor College of Medicine, a forensic pediatrician with the child protection section of the emergency center at Texas Children's Hospital, and a staff physician at the Children's Assessment Center. Dr. Isaac reviewed C.W.'s medical records and spoke with several doctors, who had treated C.W. Dr. Isaac opined that the gastrostomy tube surgery was not a necessary procedure. Dr. Isaac testified that it did not constitute reasonable medical care for C.W. to have unnecessary surgery. She further testified that the surgery constituted serious bodily injury.

The State further presented testimony from Dr. Rebecca Giradet, a pediatrician, who specializes in child abuse. Dr. Giradet reviewed C.W.'s medical records and the witness statements taken in the case. She also opined that the gastrostomy tube surgery had not been medically necessary and did not constitute reasonable medical care. Dr. Giradet explained that C.W. had always been within the normal weight curve, and he never had a failure to thrive. She also agreed that the gastrostomy tube surgery "fit the definition" of serious bodily injury.

■■ After viewing all the evidence in the light most favorable to the verdict, we conclude, in appellate cause number 01–08–00366, that a rational trier of fact could have found beyond a reasonable doubt that appellant committed the essential elements of serious bodily injury to a child younger than 15 years of age and could have also found beyond a reasonable doubt that the gastrostomy tube surgery did not consist of reasonable medical care. We hold that the evidence was legally sufficient to support the judgment of conviction in appellate cause number 01–08–00366–CR.

We overrule appellant's sixth issue in each case.

### Factual Sufficiency

In her seventh issue, appellant contends that the evidence is factually insufficient to support either judgment of conviction.

### A. Standard of Review

When reviewing the factual sufficiency of the evidence to support a conviction, we view all the evidence in a neutral light, favoring neither party, nor the explicating verdict. *See Neal v. State*, 256 S.W.3d 264, 275 (Tex.Crim.App.2008); *Watson v. State*, 204 S.W.3d 404, 414 (Tex.Crim.App. 2006). We then ask whether the evidence supporting the conviction, although legally sufficient, is nevertheless so weak that the factfinder's determination is clearly wrong and manifestly unjust or whether conflicting evidence so greatly outweighs the evidence supporting the conviction that the factfinder's determination is manifestly unjust. *Lancon v. State*, 253 S.W.3d 699, 704–05 (Tex.Crim.App.2008); *Watson*, 204 S.W.3d at 414–15, 417.

### B. Analysis

■ In conducting a factual-sufficiency review, we must consider the most important evidence that the appellant claims undermines the jury's verdict. *See Sims v. State*, 99 S.W.3d 600, 603 (Tex.Crim.App. 2003). Here, appellant does not offer separate argument for each offense. She begins by asserting that "the defense disproved that Appellant harbored in [sic] criminal intent towards [C.W.] in agreeing to the two surgical procedures in 2001."

We note, however, that the only evidence specifically identified by appellant as

undermining the verdict pertains to appellate cause number 01–08–00365–CR, which involves C.W.'s vagal nerve stimulator surgery. Evidence in the record showed that C.W. had several abnormal EEGs, which, according to Dr. Singh, indicated that C.W. may suffer from seizures. C.W.'s psychiatrist, Dr. Bernard Rosenberg, testified that he had witnessed C.W. having seizures. Appellant points out that Dr. Pedro Mancias, a child neurologist, who testified for the State, agreed on cross-examination that the vagal nerve stimulator surgery was "reasonable" at the time of the surgeries based on the abnormal EEGs and on Dr. Rosenberg's observations.

We agree that Dr. Mancias's testimony is probative of appellant's intent and supports the defense. Nonetheless, as discussed under our legal-sufficiency review, ample evidence exists in the record to show that it was appellant's reports of C.W.'s frequent seizure activity which led to the implantation of the vagal nerve stimulator. Dr. Singh testified that he would not have referred C.W. for surgery based only on the abnormal EEG tests. The doctor made clear that appellant's reports of C.W.'s seizures were key to his referral.

██ A defendant's intent may be inferred from her actions, words, conduct, and from circumstances under which the prohibited act occurs. See Moore v. State, 969 S.W.2d 4, 11 (Tex.Crim.App.1998). The State's theory that appellant fabricated or exaggerated C.W.'s seizure activity that she reported to Dr. Singh was supported by the evidence that C.W.'s seizures ceased when he was removed from appellant's care. Evidence that appellant profited financially from her children's claimed afflictions also is probative of her intent to fabricate or exaggerate C.W.'s symptoms in order to subject C.W. to unnecessary medical procedures.

As for Dr. Rosenberg's report that he observed C.W.'s seizure activity, it was for the jury, as factfinder, to judge his credibility. Dr. Rosenberg testified for the defense at trial and described the seizure activity he witnessed. On cross-examination, Dr. Rosenberg testified that appellant had babysat his children for several years. He stated that he and appellant had a "very friendly" relationship. Dr. Rosenberg admitted that he had refilled medication for appellant's children that had been prescribed by other doctors. Dr. Rosenberg acknowledged that he had earlier testified in a family court proceeding involving the children, that refilling medication prescribed by other doctors violated professional standards. At trial, however, Dr. Rosenberg stated that he had "reflected on that answer" and stated that he had refilled the medications to be "charitable" and "gracious" to appellant and did not necessarily agree that such act violated professional standards.

Ultimately, the jury was free to disbelieve Dr. Rosenberg's testimony and to credit the evidence from which it could infer that the surgery was caused by appellant's fabricated reports of C.W.'s symptoms. See Cain v. State, 958 S.W.2d 404, 407 (Tex.Crim.App.1997). In sum, the issues raised by appellant go to weight and to credibility determinations, and we must defer to the jury in these matters. See Johnson v. State, 23 S.W.3d 1, 7 (Tex. Crim.App.2000).

In support of her factual-sufficiency challenge, appellant also globally complains that the verdicts did not result from objective evidence, but rather from the introduction of evidence of extraneous bad acts of appellant, which she claims prejudiced the jury against her. She asserts, "All of the weight of the state's case came

from the extraneous evidence that was not relevant to the precise offenses charged." We disagree. As discussed under our legal-sufficiency review, the State presented ample evidence to support the elements of the charged offenses.[3] In each case, "the same facts that make the evidence legally sufficient also make it factually sufficient." *See Prible v. State,* 175 S.W.3d 724, 731 (Tex.Crim.App.2005).

We conclude that the evidence supporting the convictions was neither so weak that the factfinder's determination was clearly wrong and manifestly unjust nor did the conflicting evidence so greatly outweigh the evidence supporting the conviction that the factfinder's determination is manifestly unjust. *See Lancon,* 253 S.W.3d at 704–05; *Watson,* 204 S.W.3d at 414–15, 417. We hold that the evidence was factually sufficient to support each judgment of conviction.

We overrule appellant's seventh issue in each case.

### Deadly–Weapon Finding

The indictment in each case alleged that appellant caused C.W. serious bodily injury by "cutting him with a deadly weapon, namely, a scalpel." The jury found appellant guilty in each case, as charged in the indictment. In her fourth and fifth issues, appellant contends that "the evidence was legally insufficient to support an affirmative finding of a deadly weapon" in either case.

### A. Applicable Law

As mentioned, we review the legal sufficiency of the evidence by considering all of the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *See Jackson,* 443 U.S. at 318–19, 99 S.Ct. at 2788–89; *Hooper,* 214 S.W.3d at 13.

The Penal Code defines a "deadly weapon," in pertinent part, as "anything manifestly designed, made, or adapted for the purpose of inflicting death or serious bodily injury; or ... anything that in the manner of its use or intended use is capable of causing death or serious bodily injury...." Tex. Penal Code Ann. § 1.07(a)(17). The trial court's charge to the jury provided a definition for "deadly weapon" that tracked the statutory language. As previously mentioned, the Penal Code defines "serious bodily injury" as "bodily injury that creates a substantial risk of death or that causes death, serious permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ." *Id.* § 1.07(a)(46).

### B. Analysis

Although we are unable to locate any Texas cases that discuss whether a scalpel is a deadly weapon, this Court has previously conducted sufficiency-of-the-evidence analyses with respect to whether a knife is a deadly weapon. *See, e.g., Garcia v. State,* 17 S.W.3d 1, 4 (Tex.App.-Houston [1st Dist.] 1999, pet. ref'd). We have noted that the following factors are important when determining whether a knife is a deadly weapon: (1) the size, shape, and sharpness of the knife; (2) the manner of its use or intended use; (3) the nature or existence of inflicted wounds; and (4) testimony of the knife's life-threatening capabilities. *See id.* (citing *Thomas v. State,* 821 S.W.2d 616, 619–620 (Tex.Crim.App. 1991)).

In *Garcia,* we focused on the wounds inflicted on the complainant to determine

---

**3.** The appropriateness of the admission of the extraneous offense evidence is discussed *infra.*

whether the evidence was sufficient to support the finding that a knife was a deadly weapon. *See id.* at 5. We explained, "The nature, location, and severity of the wounds will be considered in determining whether the knife was a deadly weapon." *Id.* The analysis in *Garcia* is instructive in our determination of whether the evidence in each case here was legally sufficient to support the implicit finding that the scalpel was a deadly weapon.

Viewing the evidence in the light most favorable to the verdicts, the record shows that manner of the use of the scalpel was, at a minimum, capable of causing serious bodily injury or death in each case. The Court of Criminal Appeals has explained, "The placement of the word 'capable' is crucial to understanding this method of determining deadly-weapon status. The State is not required to show that the 'use or intended use causes death or serious bodily injury' but that the 'use or intended use is *capable* of causing death or serious bodily injury.'" *Tucker v. State*, 274 S.W.3d 688, 691 (Tex.Crim.App.2008) (quoting *McCain v. State*, 22 S.W.3d 497, 503 (Tex.Crim.App.2000)).

### 1. *Vagal Nerve Stimulator Surgery*

■ With respect to the surgery to implant the vagal nerve stimulator, the surgeon, Dr. Baumgartner, agreed that the scalpel was capable of causing serious bodily injury. Dr. Baumgartner described the surgery for the jury. He stated that an "electrode" is implanted through a small incision around the vagal nerve "which is right near the carotid artery." Then, the surgeon puts a "battery generator device in a separate place under the pectoralis." The surgeon next passes the device through "the first incision to the second incision," and then "uses that device to allow [sic] the electrode from the first incision to the second incision." Last-

ly, the surgeon attaches "it to the generating device and close[s] everything up."

C.W.'s medical records also described the procedure in great detail. Of particular relevance, the operative report states, in part, that "a horizontal incision was created sharply and dissection carried sharply through the platysma. Dissection was then carried bluntly along the mesial borders of the sternocleidomastoid to the carotid sheath. This was opened bluntly, and the vagal nerve was identified and exposed circumferentially over approximately 5 cm." The report continues, "Next, in the mid axillary line beginning three fingerbreadth below the true acilla, a vertical incision was created sharply. Dissection was carried through subcutaneous tissue down to pectoralis muscle and fascia using needle-point Bovie cautery at low coagulation settings."

Dr. Baumgartner also testified that appellant had two scars from the incisions made by the scalpel. One scar is three inches long and the other is one inch long. The doctor stated that "some people" might consider the scars permanent disfigurement. The documentary evidence showed that the risks of the surgery included infection, blood clots, bleeding, and "even death."

Viewing the evidence in the light most favorable to the verdict, we conclude that a rational trier of fact could have found beyond a reasonable doubt that the scalpel used to perform C.W.'s vagal nerve stimulator surgery caused serious bodily injury to C.W., or at a minimum, was capable, in its manner of use, of causing serious bodily injury to C.W. *See id.*

### 2. *Gastrostomy Tube Surgery*

■ With respect to the gastrostomy tube surgery, the surgeon, Dr. Minifee was asked on cross-examination whether the surgery caused serious bodily harm. Dr.

Minifee responded, "Well, [C.W.] has a scar. He was cut." When the defense asked Dr. Minifee whether the scar is "any type of protracted loss of any bodily part . . .?" Dr. Minifee responded, "Well, unfortunately, the scar, because there is an incision on his abdomen, does carry with it a risk for subsequent problems in terms of adhesions, which is a form of scar, which is the most common reason for operation for intestinal obstruction in patients."

Dr. Minifee also explained that he made a 3–centimeter incision for the surgery and clarified that C.W. "actually has two scars." The doctor testified that C.W. "has the original incision that I used to go through to get to the stomach, and then he has another scar where the tube actually came through the abdominal wall. So, there are really two scars." The defense then stated, "And certainly no damage to any organs?" Dr. Minifee answered, "[T]here is a hole that was made in the stomach and a hole made in the abdominal wall." The defense asked, "There wasn't any long-term or permanent injury resulting from the surgery on 12/11/01?" Dr. Minifee responded, "Well, I think if I make a hole in the stomach and there is a scar that comes up the abdominal wall, that's permanent." The defense asked, "So, the scarring itself is what you're referring to as what's permanent?" The doctor answered, "And how that affected the organs, yes."

Dr. Minifee also confirmed that the risks and complications associated with the gastrostomy tube surgery. He stated that the complications include infection, bleeding, "what's called blood clots that occur either within the wounds or within the veins . . . and even possibility of death."

On redirect examination, Dr. Minifee testified that, at the time of trial, he agreed that the 2001 gastrostomy tube surgery had not been medically necessary, given that C.W. was ultimately shown to not need the gastrostomy tube. Dr. Minifee agreed that performing the unnecessary procedure constituted serious bodily injury.

Viewing the evidence in the light most favorable to the verdict, we conclude that a rational trier of fact could have found beyond a reasonable doubt that the scalpel used to perform C.W.'s gastrostomy tube surgery caused serious bodily injury to C.W., or at a minimum, was capable, in its manner of use, of causing serious bodily injury to C.W. *See id.*

We hold that the evidence was legally sufficient in each cause to support the deadly-weapon finding. We overrule appellant's fourth and fifth issues in each case.

### Evidentiary Issues

In her first two issues, appellant contends that the trial court abused its discretion by admitting the medical records of C.W.'s two siblings and testimony related to the siblings' medical conditions. The State relied on this evidence to support its theory that C.W., like his siblings, were victims of medical child abuse, at times referred to as Munchausen Syndrome by Proxy, perpetrated by appellant.[4] Appellant asserts in her first issue that admission of this evidence violated Rule of Evidence 404(b)'s general prohibition of evidence of extraneous offenses or bad acts. Appellant contends in her second issue that the evidence should also have been excluded pursuant to Rule of Evidence 403 because "the extraneous of-

---

4. The preferred terminology at trial was "medical child abuse," although it was, at times, used interchangeably by the medical experts and the attorneys with the terminology "Munchausen Syndrome by Proxy" or "Factitious Disorder by Proxy."

fense evidence was substantially more prejudicial than probative."

## A. Standard of Review

When reviewing a trial court's decision to admit extraneous-offense evidence under rule 404(b), or over a Rule 403 objection, an appellate court applies an abuse-of-discretion standard. *See De La Paz v. State*, 279 S.W.3d 336, 343 (Tex.Crim.App. 2009). A trial court abuses its discretion only when its decision lies "outside the zone of reasonable disagreement." *Id.*

## B. Rule 404(b)

■■ Pursuant to Rule of Evidence 404(b), "[e]vidence of other crimes, wrongs or acts" may not be admitted during the guilt-innocence phase of trial "to prove the character of a person in order to show action in conformity therewith." Tex.R. Evid. 404(b). The Court of Criminal Appeals has explained, "Rule 404(b) is a rule of inclusion rather than exclusion. The rule excludes only that evidence that is offered (or will be used) solely for the purpose of proving bad character and hence conduct in conformity with that bad character." *De La Paz*, 279 S.W.3d at 343.

One well-established rationale for admitting evidence of uncharged misconduct is to prove the motive of the defendant for committing the offense. *See* Tex.R. Evid. 404(b); *see also Wyatt v. State*, 23 S.W.3d 18, 26 (Tex.Crim.App.2000). Courts in Texas and in other jurisdictions have held that evidence showing that a complainant's siblings were also victims of Munchausen Syndrome by Proxy, perpetrated by the parent-defendant, is admissible to show the defendant's motive. *See, e.g., Austin v. State*, 222 S.W.3d 801, 807–08 (Tex.App.-Houston [14th Dist.] 2007, pet. ref'd); *State v. Cutro*, 365 S.C. 366, 618 S.E.2d 890, 895 (2005); *State v. Hocevar*, 300 Mont. 167, 193, 7 P.3d 329, 346–47 (2000).

Courts have also held that expert testimony indicating that the complainant was a victim of Munchausen Syndrome by Proxy was admissible to show motive. *See, e.g., Reid v. State*, 964 S.W.2d 723, 730 (Tex. App.-Amarillo 1998, pet. ref'd); *People v. Coulter*, 182 Misc.2d 29, 30–31, 697 N.Y.S.2d 498, 500 (1999); *People v. Phillips*, 122 Cal.App.3d 69, 87, 175 Cal.Rptr. 703, 712 (1981).

As explained by the *Reid* court,

In the absence of a motivational hypothesis, and in light of the other information which was before the jury concerning appellant's demeanor, personality and character, including the fact that she was the mother of the child, without other relevant and reliable evidence, the conduct ascribed to appellant was incongruous and apparently inexplicable. [Munchausen Syndrome by Proxy] testimony would, if accepted by the jury, bridge that gap.

*Reid*, 964 S.W.2d at 730.

■■ Appellant contends that the siblings' medical evidence was not necessary to show motive because other evidence was admitted to show that her motivation in fabricating C.W.'s illnesses was "for the secondary gain of receiving attention and/or to collect money." She continues, "This motive could be proved by restricting the evidence solely to her conduct with [C.W.] without resorting to proving that she had the character trait of being a medically abusive mother, and she was acting in conformity with her character."

The record does not support appellant's argument. At trial, the medical experts testified that seeking secondary gain, whether attention or money, is a characteristic of medical child abuse or Munchausen Syndrome by Proxy. As explained by the *Reid* court, evidence indicating that C.W.'s siblings had also been subject to

medical child abuse was relevant to understanding the magnitude of the motivational force, which the average person would have difficulty comprehending. In short, the evidence assisted the jury in understanding what motivated a mother to harm her own child in such a pervasive and insidious manner. *See id.*

We conclude that the medical record and testimonial evidence showing that C.W.'s siblings were also victims of medical child abuse by appellant was relevant to prove motive; thus, such evidence was admissible pursuant to Rule 404(b). *See* Tex.R. Evid. 404(b); *see also Austin,* 222 S.W.3d at 808 (concluding that medical records of complainant's siblings indicating that defendant had Munchausen Syndrome by Proxy was admissible under Rule 404(b) to show motive).

Additionally, admission of the evidence showing that C.W.'s siblings were also victims of medical child abuse by appellant was permissible to provide context to the offenses. *See Prible,* 175 S.W.3d at 732. Evidence of extraneous matters is admissible as same transaction contextual evidence under Rule 404(b) when it "is so intertwined with the State's proof of the charged crime that avoiding reference to it would make the State's case incomplete or difficult to understand." *Id.; see Austin,* 222 S.W.3d at 808 (concluding, in Munchausen by Proxy case, that medical records of complainant's siblings were admissible under Rule 404(b) as same transaction contextual evidence). Because an offense is not tried in a vacuum, the jury is entitled to know all relevant surrounding facts and circumstances of the charged offense. *Moreno v. State,* 721 S.W.2d 295, 301 (Tex.Crim.App.1986).

Prohibiting reference to the disputed evidence would have provided the jury with a fragmented picture of this factually complex case. The information contained in the disputed evidence describing appellant's conduct toward C.W.'s siblings was intertwined with the conduct forming the bases of the offenses at issue and served to illuminate the nature of the offenses. The complained-of evidence showed that appellant's conduct toward C.W. was not isolated behavior, but rather was part of an overall pattern of conduct of medical abuse involving all three of her children. *See Austin,* 222 S.W.3d at 808. Absent this evidence, the jury would have struggled to understand crucial aspects of this case, including what ultimately led to the discovery, investigation, and prosecution of appellant's conduct. Because it was admissible as same transaction contextual evidence, we conclude that Rule 404(b) did not require the exclusion of the subject evidence. *See Prible,* 175 S.W.3d at 732; *see also Austin,* 222 S.W.3d at 808.

In sum, the disputed extraneous conduct evidence had logical relevance beyond character conformity. Thus, the trial court properly exercised its discretion when it overruled appellant's Rule 404(b) objection and admitted the evidence.

We overrule appellant's first issue in each case.

## C. Rule 403

█ In her second issue, appellant contends, "The extraneous offense evidence was substantially more prejudicial than probative, and hence inadmissible under Rule 403." Appellant asserts that medical evidence for C.W.'s siblings and evidence that appellant "us[ed] the children's alleged illnesses to get money, gifts, and services from state and private agencies, churches and individuals" should have been excluded pursuant to Rule 403.[5]

---

5. Appellant also cites evidence that she kept a messy house as extraneous-conduct evidence

 Rule 403 allows for the exclusion of otherwise relevant evidence when its probative value "is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence." TEX.R. EVID 403. Relevant evidence is generally admissible, but it is properly excluded under Rule 403 when its probative value is substantially outweighed by the danger of unfair prejudice. *Casey v. State*, 215 S.W.3d 870, 879 (Tex.Crim.App.2007). In keeping with the presumption of admissibility of relevant evidence, trial courts should favor admission in close cases. *Id.*

 When undertaking a Rule 403 analysis, a court must balance (1) the inherent probative force of the proffered item of evidence along with (2) the proponent's need for that evidence against (3) any tendency of the evidence to suggest a decision on an improper basis, (4) any tendency of the evidence to confuse or distract the jury from the main issues, (5) any tendency of the evidence to be given undue weight by a jury that has not been equipped to evaluate the probative force of the evidence, and (6) the likelihood that presentation of the evidence will consume an inordinate amount of time or merely repeat evidence already admitted. *Gigliobianco v. State*, 210 S.W.3d 637, 641–42 (Tex.Crim.App.2006).

**Probative Value and Need.** Here, the trial court could have reasonably concluded that the disputed evidence was highly probative of important aspects of the State's case. Demonstrating that C.W.'s siblings were also victims of Munchausen Syndrome by Proxy was critical to showing appellant's motive for committing the medical child abuse offenses against C.W. and to providing context for the offenses. *See Austin*, 222 S.W.3d at 808 (noting, in Rule 403 analysis, that evidence that siblings were also victims of Munchausen Syndrome by Proxy was critical to showing motive and to providing context to crime). Relatedly, the State's medical experts testified that the motivating force behind Munchausen Syndrome by Proxy or medical child abuse is some form of secondary gain to the perpetrator, such as financial gain. Accordingly, the evidence showing that appellant sought and received a financial benefit from her children's alleged illnesses was also highly probative of motive. For these reasons, the record also supports a finding by the trial court that the State had a significant need for the disputed evidence.

**Unfair Prejudice.** With respect to unfair prejudice, the trial court trial court could have reasonably concluded that the disputed evidence did not have a tendency to suggest a decision on an improper basis. Although the disputed evidence had potential to evoke an emotional response in the jury, it was clear from the State's presentation of the evidence that it was offered to explain the motivating forces behind the injuries and to provide context for the offenses. In addition, the trial court clearly instructed the jury with respect to the proper role of extraneous conduct evidence.

**Confusion of the Issues.** The trial of these cases was long, lasting nearly one

---

that was not admissible pursuant to Rule 403. Appellant does not direct us to where in the voluminous record she objected to this evidence based on Rule 403, and we do not find such an objection. Because her argument on appeal does not comport with any objection raised in the trial court, appellant has failed to preserve for appellate review her Rule 403 challenge to this evidence. *See* TEX R.APP. P. 33.1(a); *Montgomery v. State*, 810 S.W.2d 372, 388 (Tex.Crim.App.1991).

month. Nearly 40 witnesses testified, including over one dozen medical doctors. The evidence showing that appellant sought and received financial gain from her children's claimed illnesses comprised relatively little of the evidence admitted. Much of the testimony regarding the siblings was intermixed with testimony regarding C.W.

Here, the State was telling a story of appellant and her children, which occurred over a period of years. The disputed evidence assisted the jury in understanding the charges against appellant by providing context and by showing what motivated appellant. It was not the focus of the State's case. Thus, the trial court could have reasonably concluded that the disputed evidence did not have a tendency to confuse or distract the jury from the main issues in the case.

**Misleading the Jury.** The trial court could have reasonably concluded that the disputed evidence did not have any tendency to be given undue weight by the jury. The State's evidence regarding C.W.'s medical history was more detailed than that of his siblings and was the focus of the State's case. The evidence regarding appellant's financial motivations was not significant or greatly focused on by the State. The State neither argued nor suggested that the disputed evidence could be used to prove the elements of the offenses. The disputed evidence was presented more in the fashion of background information to aid the jury in understanding the complete story surrounding the offenses. The trial court could have reasonably concluded that the jury was equipped to evaluate the probative force of the evidence.

**Undue Delay and Needless Presentation of Cumulative Evidence.** Finally, this was a long trial. Undoubtedly, the presentation of the sibling evidence contributed to the length. However, the trial court could have reasonably concluded that it was unlikely that presentation of the sibling evidence would consume an inordinate amount of time given that this is a factually complex case, and given that the siblings' medical evidence was intertwined with much of evidence pertaining to C.W. Much of the voluminous medical record evidence was admitted on CD–ROM and not specifically discussed at trial.

The trial court could have also reasonably concluded that the evidence indicating that appellant profited from her children's alleged illnesses also would not have caused undue delay. This evidence took little time at trial to present.

In addition, the trial court could have found the disputed evidence not to be cumulative of other evidence.

In sum, after balancing the Rule 403 factors, the trial court could have reasonably concluded that the probative value of the siblings' medical evidence and of the evidence that appellant used her children's illnesses for financial gain was not substantially outweighed by the countervailing factors specified in the rule. We hold that the trial court did not abuse its discretion by admitting the evidence.

We overrule appellant's second issue.

### Comment on the Weight of the Evidence

 In her third issue, appellant contends, "The trial court made an impermissible comment on the weight of the evidence." She complains, "The trial court in its application paragraph instructed the jury that the scalpel ... was a deadly weapon. Since this was a contested issue, this constituted an impermissible comment on the weight of the evidence."

 When reviewing charge errors, an appellate court must undertake a two-step review: first, the court must deter-

mine whether error actually exists in the charge, and second, the court must determine whether sufficient harm resulted from the error to require reversal. *Abdnor v. State*, 871 S.W.2d 726, 731–32 (Tex. Crim.App.1994). As a general rule, a trial court shall deliver to the jury a written charge distinctly setting forth the law applicable to the case; it should not express any opinion as to the weight of the evidence, sum up the testimony, discuss the facts, or use any argument in its charge calculated to arouse the sympathy or excite the passions of the jury. *See* Tex. Code Crim. Proc. art. 36.14 (Vernon 2007); *Bartlett v. State*, 270 S.W.3d 147, 150 (Tex. Crim.App.2008).

In each cause, the court's charge contained the following application paragraph:

Now, if you find from the evidence beyond a reasonable doubt that on or about [date of surgery] in Harris County Texas, the defendant, the defendant, Laurie Lea Williamson, did then and there unlawfully, intentionally or knowingly cause serious bodily injury to [C.W.], a child younger than fifteen years of age, by cutting him with a deadly weapon, namely, a scalpel; or if you find from the evidence beyond a reasonable doubt that on or about [date of surgery], in Harris County, Texas, [name of surgeon] did then and there unlawfully, intentionally or knowingly cause serious bodily injury to [C.W.], a child younger than fifteen years of age, by cutting him with a deadly weapon, namely, a scalpel, and that the defendant, Laurie Lea Williamson, acting with the kind of culpability required for the offense, caused or aided, [name of surgeon], an innocent or nonresponsible person to engage in conduct prohibited by the definition of the offense, if she did, then you will find the defendant guilty as charged in the indictment.

In each cause, the trial court provided a second application paragraph, which instructed the jury regarding the reasonable medical care defense:

It is a defense to prosecution of injury to a child that the act or omission consisted of reasonable medical care occurring under the direction of or by a licensed physician.

Therefore, if you believe from the evidence beyond a reasonable doubt that on or about [date of surgery], in Harris County, Texas, the defendant, Laurie Lea Williamson, did then and there unlawfully, intentionally or knowingly cause serious bodily injury to [C.W.], a child younger than fifteen years of age, by cutting him with a deadly weapon, namely, a scalpel; or if you find from the evidence beyond a reasonable doubt that on or about [date of surgery], in Harris County, Texas, [name of surgeon] did then and there unlawfully, intentionally or knowingly cause serious bodily injury to [C.W.], a child younger than fifteen years of age, by cutting him with a deadly weapon, namely, a scalpel, and that the defendant, Laurie Lea Williamson, acting with the kind of culpability required for the offense, caused or aided, [name of surgeon], an innocent or nonresponsible person to engage in conduct prohibited by the definition of the offense, if she did; but you further believe, or you have reasonable doubt that cutting [C.W.] *with a deadly weapon, namely, a scalpel,* consisted of reasonable medical care occurring under the direction of or by a licensed physician, then you will find the defendant not guilty.

(Emphasis added.) Appellant complains of the italicized portion of the charge.

At trial, the defense, objected as follows: I have an objection on page 3 of the charge, last sentence of the application

paragraph of the defense, the wording in which I have says ... "but you further believe or you have a reasonable doubt that cutting [C.W.] with a deadly weapon, namely, a scalpel," I object to the term "deadly weapon" there because it is a comment on the weight of the evidence. Because the Court is saying that the scalpel is a deadly weapon, and we're taking issue with that.

The trial court overruled the objection.

Appellant maintains on appeal that the complained-of language constitutes charge error. In her brief, she writes,

[T]he trial court's seemingly neutral explanation of the law with respect to the scalpel being a deadly weapon constituted [an] impermissible comment on the weight of the evidence because the Defense contested the sufficiency of the evidence that the State presented in its attempt to prove that the scalpel was a deadly weapon. To correct the error, all the trial court had to do was add the phrase, "as alleged in the indictment" following each mention of the scalpel. The court failed to do so....

 A charge improperly comments on the evidence if it "assumes the truth of a controverted issue." *See Whaley v. State*, 717 S.W.2d 26, 32 (Tex.Crim.App.1986); *see also Grady v. State*, 634 S.W.2d 316, 317 (Tex.Crim.App.1982). Appellant argues that the trial court improperly commented on the weight of the evidence in the charge by assuming that the scalpel was a deadly weapon, an issue that was contested at trial.

 When read in context, the complained-of language does not assume the truth of the controverted deadly-weapon issue. The meaning of a jury instruction must be taken from the whole charge, and jurors are not authorized to return a verdict except under those conditions giv-

en by the application paragraph of the charge. *Delapaz v. State*, 228 S.W.3d 183, 212 (Tex.App.-Dallas 2007, pet. ref'd). A jury charge is adequate

if it either contains an application paragraph specifying all of the conditions to be met before a conviction under such theory is authorized, or contains an application paragraph authorizing a conviction under conditions specified by other paragraphs of the jury charge to which the application paragraph necessarily and unambiguously refers, or contains some logically consistent combination of such paragraphs.

*Id.* (quoting *Plata v. State*, 926 S.W.2d 300, 302 (Tex.Crim.App.1996), *overruled on other grounds by Malik v. State*, 953 S.W.2d 234 (Tex.Crim.App.1997)).

Reading the application paragraphs as a whole reveals that the charges permitted a guilty finding only if the jury first found from the evidence, beyond a reasonable doubt, that the scalpel was a deadly weapon. Preceding the objectionable language in the charge, each application paragraph required the jury to make the deadly-weapon finding based on the evidence beyond a reasonable doubt.

As written, the application paragraphs in the jury charges instructed the jury to find the elements of the offense and to make a deadly-weapon finding before it considered the objected-to language pertaining to the reasonable medical care defense. In other words, the application language regarding the reasonable medical care defense, including the disputed language, only became relevant after the jury had determined from the evidence, beyond a reasonable doubt, that appellant's conduct satisfied the elements of the offense and that the scalpel was a deadly weapon.

Reasonably construed, the jury charges did not assume the truth of the contested deadly-weapon issue; the jury was clearly

instructed to make that determination. We conclude that the complained-of language did not constitute a comment on the weight of the evidence by the trial court. *See Francis v. State,* 746 S.W.2d 276, 278 (Tex.App.-Houston [14th Dist.] 1988, pet. ref'd); *see also Delapaz v. State,* 228 S.W.3d at 212–13. We hold that the trial court did not err by instructing the jury as it did in the charges.

We overrule appellant's third issue in each case.

### Conclusion

We affirm the judgments of the trial court.